# EXHIBIT A

Patrick Minford                                                    December 20, 2011

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BONNIE WEBB, on behalf of
plaintiff and a class,

      Plaintiff,

v.               Case No. 11-cv-5111

MIDLAND CREDIT MANAGEMENT,
INC., MIDLAND FUNDING, LLC
and ENCORE CAPITAL GROUP,
INC.,

      Defendants.
-----------------------

DEPOSITION OF

PATRICK MINFORD

December 20, 2011

1:06 p.m.

311 Camino Del Rio North, Suite 1300

San Diego, California

Reported by Tamara L. Espino, CSR No. 9494

**Page 3**

INDEX OF EXAMINATION

WITNESS: Patrick Minford

| | EXAMINATION | PAGE |
|---|---|---|
| | By Mr. Edelman | 5 |

**Page 2**

APPEARANCES OF COUNSEL

For Plaintiff:
  EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
  DANIEL EDELMAN, ESQ.
  CASSANDRA MILLER, ESQ.
  120 South LaSalle Street, 18th Floor
  Chicago, Illinois 60603
  (312) 739-4200  Fax (312) 419-0379

For Defendants:
  HINSHAW & CULBERTSON, LLP
  DAVID M. SCHULTZ, ESQ.
  CLIFFORD YUKNIS, ESQ.
  222 North LaSalle Street, Suite 300
  Chicago, Illinois 60601-1081
  (312) 704-3662  Fax (312) 704-3001

For Deponent:
  CHRISTOPHER JHANG, ESQ.
  8875 Aero Drive, Suite 200
  San Diego, California 92123
  (858) 309-6899  Fax (858) 309-6998
  christopher.jhang@mcmcg.com

**Page 4**

INDEX TO EXHIBITS

| EXHIBITS | | MARKED |
|---|---|---|
| 1 | Declaration of Patrick Minford, with attached exhibits | 8 |



ESQUIRE

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Patrick Minford                                    December 20, 2011



13

1    MR. EDELMAN:  Let me rephrase the question.
2    Q    When did you first lay eyes upon this data
3  file that you've been describing?
4    A    I don't know when the first time I would have
5  seen it would be, sir.
6    Q    Okay.  For what purpose did you first take a
7  look at this file?
8    MR. SCHULTZ:  Object.  Calls for speculation.
9    THE WITNESS:  Again, sir, I don't know.
10 BY MR. EDELMAN:
11   Q    Was it in connection with Ms. Webb's lawsuit?
12   A    I don't know.

20   Q    Do you have any specific recollection of
21 reviewing the data file other than in connection with
22 preparing your affidavit?
23   A    No, sir, not specifically.

14

15   A    Is that a question?
16   Q    Yes.

23   Q    Other than what you see in the bill of sale,
24 do you have any knowledge of who created this file?
25   A    So, again, are you asking me which specific

15

1  individual created this file?
2    Q    Yes.
3    A    I don't know.
4    Q    Do you know which company created the file?
5    A    So, again, I think the bill of sale speaks
6  for itself.
7    Q    You have no knowledge of the subject.
8    A    So I think you're asking me to kind of
9  speculate in terms of, you know, the --
10   Q    No.  I'm just asking you, did you talk to
11 somebody who said "I made up this file, and this is what
12 you're getting"?
13   A    So that is part of the purchase process, yes.

19   Q    Do you know whether it was you or somebody on
20 your team?
21   A    I don't know.
22   Q    You have no recollection of such a
23 conversation.
24   A    No, sir.  I don't recall specifically such a
25 conversation.

16

1    Q    Was the file in the form of a disk or was it
2  simply an electronic file?
3    A    It would have been provided or it was
4  provided as an electronic file.
5    Q    Do you know who sent the file to Midland?
6    A    No, I don't know specifically.

17   Q    Do you know, was something deleted from
18 Exhibit A under "number of accounts" and "unpaid
19 balance"?
20   A    So -- I would imagine, yes.  I don't know
21 that I recall specifically, but typically what you would
22 find here is that exact information.
23   Q    And you have no recollection of what the
24 number of accounts is?
25   A    Not the exact number, no, sir.



ESQUIRE

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Patrick Minford                                    December 20, 2011

21

Redacted

Redacted

Redacted

15    Q    When was the time of close for this
16  transaction?
17    A    I'm going to refer back to the declaration
18  itself.  June 10th, 2010 is when this transaction
19  funded.
20    Q    You're saying that this document came on
21  June 10, 2010?
22    A    I don't believe that's what I said.

23

1    Q    Have you ever seen a transfer and assignment
2  document like this one in connection with any other
3  transaction?
4    A    So are you asking if I've seen bills of sale
5  for other transactions?
6    Q    No.  I'm asking if you've ever seen a
7  transfer and assignment document like Exhibit C to your
8  declaration.
9    A    Possibly.
10    Q    Can you give me any instance in which you've
11  seen a document entitled "Transfer and Assignment"?
12    A    I couldn't give you specific examples, no,
13  sir.
14    Q    But you're certain you've seen such a
15  document?
16    A    I'm not saying that I'm certain I've seen
17  such a document.  I think I said it's possible.
18    Q    Okay.  Do you have any idea who Les Gutierrez
19  is?
20    A    I don't know him personally, no, sir.
21    Q    Okay.  Do you know a Scott Silver?
22    A    Again, no, I don't know that person
23  personally, sir.

24

3    Q    Is that the same file as the 20100608 final
4  charge off Excel Sears MasterCard file that you referred
5  to previously?
6    A    I don't know.

Redacted



ESQUIRE

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Patrick Minford                                    December 20, 2011



ESQUIRE

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Patrick Minford                                    December 20, 2011



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

# EXHIBIT B

Dept. 12421
PO Box 603
Oaks, PA 19456

**mcm** Midland Credit
Management, Inc.

| MCM Account Number | |
|---|---|
| | 2716 |
| Original Creditor | |
| | CITIBANK |
| CURRENT BALANCE | |
| | $2,427.05 |
| | 10-21-2010 |

09-21-2010

#BWNHLTH
#0000 0853 4942 7162#
BONNIE WEBB

16321 - 9214

## PRE-LEGAL NOTIFICATION

Dear BONNIE WEBB,

Midland Credit Management, Inc. has made several attempts to contact you regarding this account. This letter is to inform you that we are considering forwarding this account to an attorney with the intent to initiate legal action to satisfy the debt. Upon receipt of this notice, please call immediately to discuss your options.

If we don't hear from you or receive payment by 10-21-2010, we may proceed with forwarding this account to an attorney.

### What do you need to do to stop this process from continuing?

1) Mail in $500 and call to set up your remaining payments, or
2) Call us today to see how to qualify for discounts and affordable payment plans.

**LET US HELP YOU!** Once the account goes to an attorney, our flexible options may no longer be available to you. There is still an opportunity to make arrangements with us. We encourage you to call us today;
**(800) 939-2353**

Midland Credit Management
(800) 939-2353

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION AND ADDITIONAL DETAILS ABOUT YOUR ACCOUNT.

**WHY NOW?**

* This may be your last chance to work with us before the account goes to an attorney.

* Your credit report will be updated with the payments made!*

* Once you make all of your agreed-upon payment(s) to settle your account, your credit report will be updated as 'Paid In Full'!*

**CALL US TODAY!**
(800) 939-2353

Hours of Operation:
M-Th 6am - 7pm;
Fri 6am - 5pm;
Sat 6am - 2:30pm PST

* Your credit report will not be updated if the federal reporting period has expired.

*Please tear off and return lower portion with payment in the envelope provided*



PAYMENT COUPON



Dept. 12421
PO Box 603
Oaks, PA 19456

| STATEMENT | | |
|---|---|---|
| MCM Account #: ▮▮▮2716 | | Previous Balance: $2,203.16 |
| Original Account #: ▮▮▮▮7406 | | Interest Rate: 5.00% |
| Statement Date: 09-21-2010 | Due Date: 10-21-2010 | Accrued Interest: $223.89 |
| Current Owner: Midland Funding LLC | Original Creditor: CITIBANK | Current Balance: $2,427.05 |

| Due Date | Date Received | Transactions | Amount |
|---|---|---|---|
| 10-21-2010 | 09-21-2010 | The above-referenced account was purchased by Midland Funding LLC and is serviced by Midland Credit Management, Inc. ("MCM"). The balance of $2,427.05 is due now.  Please direct all correspondence to: Midland Credit Management, Inc. | $2,427.05 |
| | | | Current Balance: $2,427.05 |

Please understand this communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.

# EXHIBIT C

2606217

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DISTRICT, COOK COUNTY

MIDLAND FUNDING LLC

          Plaintiff

    vs.

BONNIE WEBB



          Defendant(s)

Case No:

Amount Claimed: $2203.16 + costs

Return Date:   03-24-11

11M1 112387

2011 FEB 17 AM 9:41
DOROTHY BROWN
CLERK

### COMPLAINT

The Plaintiff, MIDLAND FUNDING LLC, claims as follows:

1.   The Defendant(s) BONNIE WEBB
    is/are a resident of COOK County, Illinois.

2.   The Defendant(s) opened a charge account with CITIBANK
    agreeing to make monthly payments as required by the terms of the Charge Agreement, for the purchases
    charged to the account.

3.   Plaintiff is the successor in interest of said account from CITIBANK
    having purchased said account in the regular course of business in good faith and for value.

4.   The Defendant(s) did make purchases and charged same to the account but failed to make the monthly
    called for on the account.  There is a balance due and owing $2203.16.
    payments (See Client affidavit as Plaintiff's Exhibit No. 1.)

5.   Plaintiff declared Defendant(s) to be in default and demands payment of balance.


**WHEREFORE**, the Plaintiff, MIDLAND FUNDING LLC, prays for judgment against the
Defendant(s), BONNIE WEBB   , in the
amount of $2203.16 plus costs.


Blatt, Hasenmiller, Leibsker & Moore, LLC - 01237
125 South Wacker Drive, Suite 400
Chicago, IL 60606
(866) 269-9858

THIS COMMUNICATION IS FROM A DEBT COLLECTOR

BLCCP (02/2003)

# EXHIBIT D

EX #1

State of ILLINOIS

MIDLAND FUNDING LLC,

Plaintiff

-vs-

WEBB, BONNIE,

Defendant(s).

AFFIDAVIT OF PAULA HANSEN
IN SUPPORT OF JUDGMENT

---

Paula Hansen, whose business address is 16 Mcleland Rd Suite101, St. Cloud, MN 56303, certifies and says:

1.      I am employed as a Legal Specialist and have access to pertinent account records for Midland Credit Management, Inc. ("MCM"), servicer of this account on behalf of plaintiff. I am a competent person over eighteen years of age, and make the statements herein based upon personal knowledge of those account records maintained on plaintiff's behalf. Plaintiff is the current owner of, and/or successor to, the obligation sued upon, and was assigned all the rights, title and interest to defendant's CITIBANK account 5121079713267406 (MCM Number 8534942716) (hereinafter "the account"). I have access to and have reviewed the records pertaining to the account and am authorized to make this affidavit on plaintiff's behalf.

2.      I am familiar with the manner and method by which MCM creates and maintains its business records pertaining to this account. The records are kept in the regular course of business. It was in the regular course of business for a person with knowledge of the act or event recorded to make the record or data compilation, or for a person with knowledge to transmit information thereof to be included in such record. In the regular course of business, the record or compilation is made at or near the time of the act or event. The relevant financial information concerning the account includes the following:

3.      The account shows that the defendant(s) owed a balance of $2203.16.

---

AFFIDAVIT OF PAULA HANSEN IN SUPPORT OF JUDGMENT -1





# EXHIBIT E

14 Fla. L. Weekly Supp. 975b

1.

**Contracts -- Standing -- Assignment -- Where records custodian testified that she knew account sued on was owned by plaintiff only because of information stored in computer and failed to supply any supporting documentation, and bill of sale and assignment presented by plaintiff fails to sufficiently identify defendant's account as one of accounts assigned or sold to plaintiff by bank, plaintiff is unable to prove it has standing to bring action**

UNIFUND CCR PARTNERS, assignee of FIRST USA BANK, Plaintiff, v. DONNA CAVENDER, Defendant. County Court, 9th Judicial Circuit in and for Orange County. Case No. 2007-CC-3040, Division 73. July 20, 2007. Deb S. Blechman, Judge. Counsel: Gary Lublin, for Plaintiff. Dennis Chen, ChenLaw, PA, Ocoee, for Defendant.

### FINAL JUDGMENT FOR THE DEFENDANT

This cause came on to be heard at Trial in open Court on June 7, 2007. In attendance were the Plaintiff (by telephone), the Defendant, attorney Gary Lublin for the Plaintiff, and attorney Dennis Chen for the Defendant. The Court having heard from counsel for the parties, examined the Court file, and having received testimony, makes the following:

FINDINGS OF FACT:

1. Plaintiff filed an Amended Complaint on January 5, 2007 and, as a result, this matter was transferred from the circuit court to this Court by Order on March 1, 2007.

2. Defendant filed an Answer to the Amended Complaint on February 20, 2007.

3. On March 27, 2007, after a hearing in which amended pleadings were authorized, Defendant filed Amended Answer and Affirmative Defenses, Motion to Compel Discovery, and Second Request for Production. Defendant's Affirmative Defenses raised the defenses of a) standing, b) failure to attach a copy of the contract sued upon, and c) statute of limitations.

4. The Court decided, in a hearing on April 2, 2007, that a trial date would be scheduled and that all documents to be used at trial were to be served on opposing counsel no less than thirty days prior to trial or be subject to exclusion.

5. Plaintiff filed two documents in support of their claim on April 16, 2007: i. Bill of Sale, and ii. Assignment.

6. Defendant filed a Motion to Amend the Amended Answer and Affirmative Defenses (Amended Answer) and to substitute with Second Amended Answer and Affirmative Defenses (Second Answer) on May 8, 2007. The Second Answer is identical to the Amended Answer with the exception that the Second Answer includes a claim for taxable costs to include attorney's fees.

7. A hearing was held on June 4, 2007, in which the Court reserved jurisdiction over the attorney's fees issue until after the trial scheduled for June 7, 2007. The Court also offered to continue the trial to a later date but both parties refused the offer.

8. Chris Bryan, records custodian for Plaintiff, testified on behalf of the plaintiff and admitted that there were relevant documents regarding account ownership that the Plaintiff had failed to file with the Court. She stated that she knows the account is owned by the plaintiff only because of information stored in their computer system. She did not have any supporting documents before her.

CONCLUSIONS OF LAW:

The Court has reviewed the documents presented by the Plaintiff, Bill of Sale and the Assignment, and finds that they fail to sufficiently identify the accounts that were assigned or sold to the Plaintiff. Neither the Bill of Sale nor the Assignment indicate the account numbers or names of account holders. They do not provide any information that would allow the Court to determine if the alleged account of Defendant was one of the accounts sold or assigned to the Plaintiff.

Without any indicia of ownership that would sufficiently identify the true owner of the account at the time that Plaintiff filed this action, the Plaintiff is unable to prove that it had standing to bring the action. An assignment is the basis of the Plaintiff's standing to invoke the processes of the Court in the first place and is therefore an essential element of proof. *Progressive Express Ins. Co. v. McGrath Community Chiropractic*, 913 So. 2d 1281, 1285 (Fla. 2nd DCA 2005); *Oglesby v. State Farm Mutual Automobile Ins. Co.*, 781 So. 2d 469 (Fla. 5th DCA 2001). "Only the insured or medical provider 'owns' the cause of action against the insurer at any one time." *Id.* at 470.

ORDERED and ADJUDGED:

That the Plaintiff, Unifund CCR Partners, shall take nothing from the Defendant, Donna Cavender.

\* \* \*

# EXHIBIT F

Certified Copy

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION

BONNIE WEBB, on behalf of plaintiff
and a class,

        Plaintiff(s),

vs.

MIDLAND CREDIT MANAGEMENT,
INC.; MIDLAND FUNDING, LLC; and
ENCORE CAPITAL GROUP, INC.,
formerly MCM CAPITAL GROUP, INC.,

        Defendant(s).

Case No. 11-CV-5111

**DEPOSITION OF**

**PAULA HANSEN**

December 22, 2011
10:30 a.m.

16 McLeland Road, Suite 101
St. Cloud, Minnesota

Reid Bryce Robbins, Shorthand Reporter



ESQUIRE

Toll Free: 866.646.0618
Facsimile: 612.332.4233

Suite 500
701 4th Avenue South
Minneapolis, MN 55415
www.esquiresolutions.com

Paula Hansen                                           December 22, 2011

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted


ESQUIRE

Toll Free: 866.646.0618
Facsimile: 612.332.4233

Suite 500
701 4th Avenue South
Minneapolis, MN 55415
www.esquiresolutions.com

# EXHIBIT G







# COLLECTION DEFENSE
## 2011 QUICKGUIDE

DANIEL A. EDELMAN

QG200

In June 2004, the Minnesota Attorney General sued two collection agencies that represent debt buyers, claiming that the companies used illegal tactics to coerce consumers into paying invalid debts. One repeatedly called innocent consumers despite requests to stop, while the other ignored written disputes filed by consumers.

In 2004, the Federal Trade Commission shut down a debt buyer called CAMCO headquartered in Illinois. The following is from a press release issued by the FTC in connection with that case:

> **In papers filed with the court, the agency charged that as much as 80 percent of the money CAMCO collects comes from consumers who never owed the original debt in the first place. Many consumers pay the money to get CAMCO to stop threatening and harassing them, their families, their friends, and their co-workers.**
>
> **According to the FTC, CAMCO buys old debt lists that frequently contain no documentation about the original debt and in many cases no Social Security Number for the original debtor. CAMCO makes efforts to find people with the same name in the same geographic area and tries to collect the debt from them — whether or not they are the actual debtor. In papers filed with the court, the FTC alleges that CAMCO agents told consumers — even consumers who never owed the money — that they were legally obligated to pay. They told consumers that if they did not pay, CAMCO could have them arrested and jailed, seize their property, garnish their wages, and ruin their credit. All of those threats were false, according to the FTC.** News Release, FTC, *FTC Asks Court to Halt Illegal CAMCO Operation* (Dec. 8, 2004), www.ftc.gov/opa/2004/12/camco.shtm.

## C.  [1.3]   Proof the Debt Buyer Owns the Debt

The possibility that a debt buyer is suing on a debt it does not own is very real. A consumer cannot know, and should not assume, that a debt buyer actually owns the debt or that a debt collector is authorized to act by the true owner of the debt. There are many instances in which a consumer pays the debt only to receive a call two months later from another debt collector about the same debt.

A New York court with a high volume of collection cases recently noted:

> **[O]n a regular basis this court encounters defendants being sued on the same debt by more than one creditor alleging they are the assignee of the original credit card obligation. Often these consumers have already entered into stipulations to pay off the outstanding balance due the credit card issuer and find themselves filing an order to show cause to vacate a default judgment from an unknown debt purchaser for the same obligation.** *Chase Bank USA, N.A. v. Cardello,* 27 Misc.3d 791, 896 N.Y.S.2d 856, 857 (N.Y. City Civ. 2010).

An article that appeared in the trade press shortly before the 2007 extension of the Illinois Collection Agency Act, 225 ILCS 425/1, *et seq.*, to debt buyers stated:

> **More collection agencies are turning to the debt resale market as a place to pick up accounts to collect on. Too small to buy portfolios directly from major credit issuers, they look to the secondary market where portfolios are resold in smaller chunks that they can handle.**
>
> **But what they sometimes find in the secondary market are horror stories: The same portfolio is sold to multiple buyers; the seller doesn't actually own the portfolio put up for sale; half the accounts are out of statute; accounts are rife with erroneous information; access to documentation is limited or nonexistent.** Corinna C. Petry, *Do Your Homework; Dangers often lay hidden in secondary market debt portfolio offerings. Here are lessons from the market pros that novices can use to avoid nasty surprises.* Collections & Credit Risk, Mar. 1, 2007, at 24.

Recently, a debt buyer was convicted of a scheme to sell 86,000 accounts that he did not own. He had actually sold over 10,000 at the time he was caught. *United States v. Goldberg,* No. 9:09-cr-80030-KAM-1 (S.D.Fla., indictment filed Mar. 5, 2009, judgment entered Nov. 13, 2009). One of the purchasers filed a lawsuit complaining that it had purchased 6,521 of the accounts. *RMB Holdings, LLC v. Goldberg & Associates, LLC,* No. 3:2007cv00406 (E.D.Tenn. Oct. 30, 2007). On May 29, 2008, a decision was issued in favor of the plaintiff in that case. *RMB Holdings, LLC v. Goldberg & Associates, LLC,* No. 3:07-CV-406 (E.D.Tenn. May 29, 2008). The court found that "RMB began making attempts to collect the accounts it purchased from Goldberg" even though "Goldberg never delivered title or ownership of the accounts to RMB." *See also Old National Bank v. Goldberg & Associates, LLC,* No. 08-80078-CIV, 2008 WL 4104465 (S.D.Fla. Sept. 4, 2008).

Other debt buyers have voiced similar complaints about defective title to debts. *Florida Broker Faces Multiple Lawsuits,* Collections & Credit Risk, Apr. 2008, at 8.

Reported decisions indicate that debt buyers commonly obtain information about accounts that they do not in fact purchase, or that are purchased but then returned to the seller. *Chase Bank USA, N.A. v. Unifund Portfolio A LLC,* No. 09 Civ. 9795, 2010 WL 3565169 (S.D.N.Y. Sept. 13, 2010) (information about non-purchased accounts was to be destroyed). A debt buyer's possession of information about a given debtor, without testimony or evidence that it actually purchased the specific account, is thus not proof that it owns the account.

There are reported cases in which debtors have been subjected to litigation because they settled with *A,* and then *B* claimed to own the debt. *Smith v. Mallick,* 514 F.3d 48 (D.C.Cir. 2008) (when commercial debt was purchased and resold by debt buyer and debt buyer (possibly fraudulently) settled debt it no longer owned, settlement held binding because notice of assignment not given, but obligor subjected to litigation as result). *See also Miller v. Wolpoff & Abramson, LLP,* No. 1:06-CV-207-TS, 2008 WL 474202 (N.D.Ind. Feb. 19, 2008), in which a debtor complained he had been sued twice on the same debt; *Dornhecker v. Ameritech Corp.,* 99

F.Supp.2d 918, 923 (N.D.Ill. 2000), in which the debtor claimed he settled with one agency and was then dunned by a second for the same debt; and *Northwest Diversified, Inc. v. Desai*, 353 Ill.App.3d 378, 818 N.E.2d 753, 288 Ill.Dec. 818 (1st Dist. 2004), in which a commercial debtor paid the creditor only to be subjected to a levy by a purported debt buyer.

In *Wood v. M & J Recovery LLC*, No. CV 05-5564, 2007 WL 1026372 (E.D.N.Y. Apr. 2, 2007), a debtor complained of multiple collection efforts by various debt buyers and collectors on the same debt, and the defendants asserted claims against one another disputing the ownership of the portfolio involved. Shekinah alleged that it sold a portfolio to NLRS, that NLRS was unable to pay, that the sale agreement was modified so that NLRS would obtain only one fifth of the portfolio, and that the one fifth did not include the plaintiff's debt. Portfolio Partners claimed that it, and not Shekinah, was the rightful owner of the portfolio.

In *Associates Financial Services Co. v. Bowman, Heintz, Boscia & Vician PC*, No. IP99-1725-C-M/S, 2001 U.S.Dist. LEXIS 7874 at **9 – 12 (Apr. 25, 2001), *later opinion*, 2004 U.S.Dist. LEXIS 6520 (S.D.Ind. Mar. 31, 2004), allegations were made that a creditor had continued to collect accounts allegedly sold to a debt buyer.

In *Capital Credit & Collection Service, Inc. v. Armani*, 227 Or.App. 574, 206 P.3d 1114 (2009), a debt collector was found to have settled a debt and then instituted litigation on it. In *David J. Gold, P.C. v. H&K Investigations, Inc.*, No. 604026/2006, 2010 NY Slip Op 30538(U) (N.Y.Sup. Mar. 8, 2010), one debt collector sued another, claiming that it had, without authority, assigned its account to a second debt collector that had misidentified the judgment creditor and inflated the judgment amount.

Courts have dismissed numerous foreclosure and collection lawsuits that have been filed in the names of entities that do not own the purported debts. *In re Foreclosure Cases*, No. 1:07CV2282, 2007 WL 3232430 (N.D. Ohio Oct. 31, 2007) (15 foreclosure cases combined). In the Ohio cases, foreclosure complaints alleged that the named plaintiffs were the holders and owners of the notes and mortgages, but they were not the original payees, and there was nothing showing that the plaintiffs owned the notes and mortgages at the time suit was filed. Dismissing the cases, the court commented:

> **There is no doubt every decision made by a financial institution in the foreclosure process is driven by money. And the legal work which flows from winning the financial institution's favor is highly lucrative. There is nothing improper or wrong with financial institutions or law firms making a profit — to the contrary, they should be rewarded for sound business and legal practices. However, unchallenged by underfinanced opponents, the institutions worry less about jurisdictional requirements and more about maximizing returns. Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through. Counsel for the institutions are not without legal argument to support their position, but their arguments fall woefully short of justifying their premature filings, and utterly fail to satisfy their standing and jurisdictional burdens. The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice**

equates with legal compliance. Finally put to the test, their weak legal arguments compel the Court to stop them at the gate. 2007 WL 3232430 at *3.

Subsequently, dozens of other mortgage cases were thrown out or had show-cause orders entered for the same reason. *In re Foreclosure Cases,* No. 07-cv-166, 2007 U.S.Dist. LEXIS 90812 (S.D. Ohio Nov. 27, 2007) (19 foreclosure cases combined); *In re Foreclosure Cases,* 521 F.Supp.2d 650 (S.D. Ohio 2007); *In re Foreclosure Cases,* No. 07-cv-166, 2007 WL 4589765 (S.D. Ohio, Dec. 27, 2007) (15 foreclosure cases combined); *NovaStar Mortgage, Inc. v. Riley,* No. 3:07-CV-397, 2007 WL 4190802 (S.D. Ohio Nov. 21, 2007); *NovaStar Mortgage, Inc. v. Grooms,* No. 3:07-CV-395, 2007 WL 4190796 (S.D. Ohio Nov. 21, 2007); *HBC Bank USA v. Rayford,* No. 3:07-CV-428, 2007 WL 4190805 (S.D. Ohio Nov. 21, 2007); *Everhome Mortgage Co. v. Rowland,* No. 07AP-615, 2008 WL 747698 (Ohio App. Mar. 20, 2008) (judgment for plaintiff reversed because it failed to introduce assignment or establish that it was holder of note and mortgage); *Deutsche Bank National Trust Co. v. Castellanos,* 18 Misc.3d 1115(A), 856 N.Y.S.2d 497 (N.Y.Sup. 2008) (Schack, J.) (text available in Westlaw); *HSBC Bank USA, N.A. v. Valentin,* 14 Misc.3d 1123(A), 859 N.Y.S.2d 895 (N.Y.Sup. 2008) (text available in Westlaw); *HSBC Bank USA, N.A. v. Cherry,* 18 Misc.3d 1102(A), 856 N.Y.S.2d 24 (N.Y.Sup. 2007) (text available in Westlaw); *Deutsche Bank National Trust Co. v. Castellanos,* 15 Misc.3d 1134(A), 841 N.Y.S.2d 819 (N.Y.Sup. 2007) (text available in Westlaw). *See also Deutsche Bank National Trust Co. v. Steele,* No. 2:07-cv-886, 2008 WL 111227 (S.D. Ohio Jan. 8, 2008) (text available in Westlaw); *DLJ Mortgage Capital, Inc. v. Parsons,* No. 07-MA-17, 2008 WL 697400 (Ohio App. Mar. 13, 2008); *Washington Mutual Bank, F.A. v. Green,* 156 Ohio App.3d 461, 806 N.E.2d 604 (2004).

The author has encountered several cases in which debts were paid or settled to one entity, after which another tried to collect the entire debt or the remaining portion.

The Illinois Supreme Court has held that an assignee must prove the assignment. *McFarland v. Dey,* 69 Ill. 419, 422 (1873) ("We are unable to perceive how the complainant has any interest in this property, save that which he has as assignee of the debt. That interest being denied, it was incumbent on him to prove it."). *Accord Board of Managers of Medinah on Lake Homeowners Ass'n v. Bank of Ravenswood,* 295 Ill.App.3d 131, 692 N.E.2d 402, 405, 229 Ill.Dec. 629 (3d Dist. 1998) ("Once established, an assignment places the assignee into the shoes of the assignor.").

Clearly, a consumer cannot know, and should not assume, that a debt buyer actually owns the debt or that a debt collector is authorized to act by the true owner of the debt. As noted above, there are many instances in which a consumer pays the debt only to later receive a call from another debt collector about the same debt. A consumer has the right to receive proof that the debt collector owns the debt. Even if the consumer recognizes the debt and believes he or she owes it, the consumer should request, at a minimum, some proof of ownership.

Many consumer debts are "securitized," or transferred to third parties or trustees for the purpose of permitting investment, with "servicing" retained by the originator.

The actual ownership of the debt should be inquired into in all cases.

EXHIBIT H



# The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases

## Peter A. Holland

## No. 2011 - 32



This paper can be downloaded free of charge at:
The Social Science Research Network Electronic Paper Collection
http://ssrn.com/abstract=1875727

| holland_jci2 | 7/25/2011 1:19 PM |

PETER A. HOLLAND*

# The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases

### ABSTRACT

*Recent years have seen the rise of a new industry which has clogged the dockets of small claims courts throughout the country. It is known as the "debt buyer" industry. Members of this $100 billion per year industry exist for no reason other than to purchase consumer debt which others have already deemed uncollectable, and then try to succeed in collecting where others have failed. Debt buyers pay pennies on the dollar for this charged off debt, and then seek to collect, through hundreds of thousands of lawsuits, the full face value of the debt. The emergence and vitality of this industry presents several legal, ethical and economic issues which merit exploration, study and scholarly debate.*

*This article focuses on the problem of robo-signing and the lack of proof in debt buyer cases. Although this problem has received limited attention from the media and from regulators, there is a paucity of legal scholarship about debt buyers in general, and this problem in particular. This article demonstrates that robo-signing and fraud are rampant in this industry, and that the debt buyers who pursue these claims often lack proof necessary to show that they own the debt, and often lack proof even that a debt was ever owed in the first place. The fact that this lack of proof has led to consumers being sued twice on the same debt demonstrates the due process concerns which are implicated when courts enter judgments against consumers based on robo-signing and insufficient proof.*

© 2011 Peter A. Holland

* Visiting Assistant Professor, University of Maryland School of Law. This piece grew out of the work my students and I have done the past two years in litigating debt buyer cases in the law school's Consumer Protection Clinic. Special thanks go to clinic students Max Brauer, Ted Reilly and Dillon Yeung, each of whom helped develop this piece through their work on cases in our clinic. Special thanks also go to Amy Caiazza, Ph.D., J.D. for her excellent research and editorial assistance. Finally, thanks to my colleagues at the University of Maryland School of Law.

THE ONE HUNDRED BILLION DOLLAR PROBLEM

*This article calls on courts to hold plaintiffs in debt buyer cases to the same standards required of other litigants. Courts must require a demonstration of personal knowledge of the matter at issue before any affidavit is accepted, before any person testifies, and before any documents are admitted into evidence.*

I. INTRODUCTION

A VICTIM OF IDENTITY THEFT RECEIVES A CREDIT CARD BILL FOR $4,000 on a fraudulent account about which she has no knowledge. Although the bank holding the account acknowledges the identity theft and closes the account, the bank later sells the account to a debt buyer, which makes harassing phone calls and threatens to sue the victim.

A widowed senior citizen files for bankruptcy, and obtains a full discharge of all credit card debt. Despite this, two of her credit card accounts are sold to a debt buyer, and she gets sued on an account which the bankruptcy court has already discharged.

A veteran settles a debt with his credit card company and obtains a full release from any further liability. Nevertheless, the credit card company sells this account to a debt buyer and he gets sued, even though the debt has already been satisfied.

Some version of each of the above scenarios is replicated every day in states across the country.

One common thread in the consumers' stories above is the fact that their adversaries never actually extended credit to these consumers. Rather, these adversaries are purchasers of defaulted debt. The goal of the debt buyer is to purchase—for pennies on the dollar—debts that have already been deemed uncollectable by the original creditor, and then collect all, most or some of the debt and thereby make a handsome profit.[1] Once deemed uncollectable, these debts are bought and sold, often several times over, sometimes for just a fraction of a penny on the dollar.[2] It is not uncommon for a debt buyer to pay as little as $30.00 for an old credit card debt

---

1. *See* Laura Gunderson, *Take Good Sniff Before 'Settling' Old Bills*, THE OREGONIAN, Oct. 4, 2009 ("[A] zombie or scavenger debt collector . . . buy[s] up old, typically charged-off accounts for a fraction of the original amount and tr[ies] to track down the debt—often after it has or is about to expire and sometimes, even after it's already been paid.")

2. *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-09-748, CREDIT CARDS: FAIR DEBT COLLECTION PRACTICES COULD BETTER REFLECT THE EVOLVING DEBT COLLECTION MARKETPLACE AND USE OF TECHNOLOGY, 28-29 (2009) (Estimating cost of as little as one to two cents per dollar depending on its age and other qualities; noting that "resale of debt has increased in recent years . . . and debt can be resold multiple times. One debt buyer estimated that almost half of all credit card accounts purchased directly from original creditors eventually are resold.")

PETER A. HOLLAND

on which the payday could be more than $1,000.00.[3] When collection proves un-fruitful, the debt is sold again.[4] Debts which seemingly die and then come to life again are known as "zombie debts."[5]

Debt buyers shy away from large-value cases, which would require formal proof that complies with the forum state's rules of evidence. Instead, debt buyers rely on overburdened "small claims courts," where the state court formal rules of evidence typically do not apply.[6] There, debt buyers argue that the court need not apply evidentiary standards such as hearsay, authenticity of documents, proof of chain of assignment, or certainty as to the amount of damages.[7] Rather, the debt buyers argue that informal proof of the debt, such as affidavits by a debt buyer's own employee,

---

3. For example, in its March 28, 2011 press release charging one of the nation's largest debt buyers with robo-signing, the Minnesota Attorney General, citing the publicly traded Encore Capital Group, Inc.'s most recent Form 10-K statement, pointed out that Encore and its subsidiaries, Midland Funding LLC and Midland Credit Management, Inc., spent less than $2 billion to obtain almost $55 billion (i.e.3 cents on the dollar) to obtain charged off debt, on which it then filed 245,000 collection lawsuits:

> Midland and its publicly-traded parent corporation, Encore Capital Group, Inc., have paid more than $1.8 billion to obtain 33 million customer accounts with a face value of about $54.7 billion, or an average cost of about three cents on the dollar, according to Encore's 2010 Form 10-K. Midland and Encore buy electronic portfolios containing billions of dollars of old, charged-off consumer debt from credit card companies, banks, telecommunications firms, and other creditors. These include Bank of America, JPMorgan Chase, Citibank, Wells Fargo, HSBC, Providian, and Verizon Wireless, among others. Several of these banks, including Bank of America, JPMorgan Chase, and Citibank, also provided Midland with financing to pursue its debt acquisitions and collections. For example, Encore currently has a $410 million revolving credit line to acquire consumer debt from many of the same banks that have sold debt to Midland, including JPMorgan Chase, Bank of America, and Citibank.

See http://www.ag.state.mn.us/consumer/pressrelease/110328debtbuyers.asp

4. See CLAUDIA WILNER & NASOAN SHEFTEL-GOMES, NEIGHBORHOOD ECON. DEV. ADVOCACY PROJECT, ET AL., DEBT DECEPTION: HOW DEBT BUYERS ABUSE THE LEGAL SYSTEM TO PREY ON LOWER-INCOME NEW YORKERS 13 (2010), available at http://www.nedap.org/pressroom/documents/DEBT_ DECEPTION_FINAL_WEB.pdf (discussing an aspect of the debt buying process where debt is sold again after collection efforts have proven unsuccessful or futile).

5. See, e.g., Liz Pulliam Weston, Zombie Debt is Hard to Kill, MSN MONEY, July 24, 2006, available at http://articles.moneycentral.msn.com/SavingandDebt/ManageDebt/ZombieDebtColle ctorsDigUpYourOld-Mistakes.aspx; Henry Woodward, Beware the Return of the Undead Debt, ROANOKE TIMES, Nov. 7, 2010, at 1 ("Zombie debt is mostly credit card accounts come back from the dead—so long overdue that the credit card issuers had given up on collecting it.").

6. See, e.g., MD. R. EVID. 5-101, which states that, except for the rules relating to competency of witnesses, the Maryland rules of evidence do not apply to small claim actions. See also, Lauren Goldberg, Dealing in Debt: The High-Stakes World of Debt-Collection After FDCPA, 79 S. CAL. L. REV. 711, 729, 741–45 (2006) ("The minimal procedural formalities, relaxed rules of evidence, and less onerous pleading requirements of small-claims courts offer collection lawyers a swift sword of judgment against debtors and give lawyers leeway to file cases that would not survive in general civil court."). Black's Law Dictionary defines "small-claims court" as "a court that informally and expeditiously adjudicates claims that seek damages below a specified monetary amount, usu. claims to collect small accounts or debts." BLACK'S LAW DICTIONARY (9th ed. 2009).

7. Id.

THE ONE HUNDRED BILLION DOLLAR PROBLEM

should be sufficient to prove standing to sue (i.e. chain of assignment uninterrupted from original creditor to the current debt buyer), liability and damages.[8]

According to one debt buyer industry group known as the Association of Credit and Collection Professionals, (commonly referred to as "ACA International"), there is a "challenge to obtain original documentation" of purchased debt, including the "contract underlying the debt at issue." [9] According to ACA International, documentation "establishing proof [that] the consumer debt at issue existed" is often lacking.[10] In the words of ACA International, the documentation "is often unattainable for a variety of reasons, the most important of which is that the original creditor no longer has the information or did not have it when selling an account or turning an account over for collection."[11]

Rather than a true adversary system, the debt buyer litigation model is characterized by a sophisticated business represented by a skilled lawyer suing an unsophisticated, unrepresented consumer in which no formal rules of evidence are applied, and rank hearsay is rampant.[12]

This article examines the debt buying industry as it functions within the small claims courts system, from the standpoint of consumer protection, where the amount in controversy in any given case is, for example in Maryland, less than $5,000.00.[13] The author concurs with the conclusion reached by the Federal Trade Commission that "the current system is broken" and that substantial reforms are needed.[14] This article argues that access to justice is currently under attack by the purveyors of shoddy evidence because of lax—and often unenforced—procedural

8.  Rick Jurgens & Robert J. Hobbs, *The Debt Machine: How the Collection Industry Hounds Consumers and Overwhelms Courts*, NAT'L CONSUMER LAW CTR., 21, 23 (July 2010), *available at* http://www.nclc.org/images/pdf/pr-reports/debt-machine.pdf.

9.  Letter from ACA International to the Maryland Court of Appeals Standing Committee on Rules of Practice and Procedure District Court Subcommittee (Jan. 19, 2011)(on file with the author).

10.  *Id.* at 2.

11.  *Id.*

12.  *See* WILNER & SHEFTEL-GOMES, *supra* note 4, at 1; Jurgens & Hobbs, *supra* note 8, at 5. Wilner and Sheftel-Gomes discussed the legal issues implicated in lawsuits arising from unethical debt buying practices and noted that the due process doctrine is implicated when the defendants do not receive notice of the lawsuits or knowledge of their legal defenses. *See* WILNER & SHEFTEL-GOMES, *supra* note 4, at 1. Standing issues and laws of Evidence, Contracts and Torts are implicated when debt buyers fail to obtain documentation of original lending contracts, which subsequently lead to dismissal of cases that lack evidence of contractual rights to receive the underlying debt. *See id.* at 5–7 (discussing debt buyers' deceptive collection methods, lack of documentation of debts, lack of contractual right to documentation of debts, and lack of admissible evidence of the debt); Jurgens & Hobbs, *supra* note 8, at 5 (describing debt collectors' various methods of harassing debtors).

13.  *See infra* notes 38–44 and accompanying text (discussing the underlying perspectives of the consumer debt buying industry and the inadequate protective services for consumers).

14.  *See infra* notes 42–43 and accompanying text.

holland_jci2                             7/25/2011 1:19 PM

· PETER A. HOLLAND

rules, and that greater enforcement of existing procedural safeguards is needed.[15] Like the robo-signing crisis which is now infamous in the foreclosure context, similar issues of robo-signing and other shortcuts have led to a de facto system of robo-justice, which all too often wrongly enters judgment against unrepresented consumers, despite lack of sufficient proof as to liability, standing or damages.[16]

Because the formal rules of evidence generally do not apply in small claims cases,[17] courts may overrule objections based on hearsay and the unreliability of documents alleged to be "business records" submitted as proof of the existence of a debt. As a result, debt buyers are able to admit hearsay into evidence in small claims courts that they would not be able to admit in large claims courts where the formal rules of evidence would preclude the hearsay. As many observers have noted, and as the industry itself has admitted, debt buyers and even original creditors frequently lack sufficient documentation to prove standing, liability and damages.[18] Yet, despite this lack of proof, debt buyers have been successful at winning billions of dollars in default judgments through our court system.[19] It is this author's view that if courts were more vigilant in requiring (1) basic proof regarding a consumer's underlying liability on a contract, (2) a debt buyer's standing to sue by virtue of an uninterrupted chain of title, and (3) accurately calculated damages, the system would relieve overburdened dockets and produce fairer results for all involved.

In Part II, I examine the nature and history of the debt buying industry. I trace its growth, its business model, and the legal strategies it employs to collect consumer debt. In Part III, I argue that courts must demand stricter proof from debt buyers. In doing so, I survey the legal requirements which exist in Maryland and in other states for the admission of the type of documentary evidence which is typical in debt buyer cases. Part III also explains how and why rank hearsay is routinely admitted in small claims actions, and the impact this has on access to justice, and I argue that in debt buyer cases, it is essential to require personal knowledge of affiants and testifying witnesses. In Part IV the article concludes that courts, as the gate keepers in charge of access to justice, must insist that witnesses have personal knowledge of the matters about which they seek to testify in debt buyer cases.

---

15.   *See infra* notes 51–56.

16.   *See infra* Part III.

17.   *See* for example Maryland Rule 5-101 which states in pertinent part: "The rules in this Title other than those relating to the competency of witnesses do not apply to the following proceedings: . . . (4) Small claim actions under Rule 3-701 and appeals under Rule 7-112(d)(2). . . ." MD. R. EVID. 5-101.

18.   WILNER & SHEFTEL-GOMES, *supra* note 4, Goldberg, *supra* note 6, at 745–46. *See also, supra* note 9.

19.   *See infra* Part II.

HOLLAND_jci2 (DO NOT DELETE)                                                                 7/25/2011 1:19 PM

THE ONE HUNDRED BILLION DOLLAR PROBLEM

## II. THE DEBT BUYING INDUSTRY

In the midst of the worst financial crisis since the Great Depression, 14.6 percent of the U.S. population have lost their jobs and the unemployment rate remains at a staggering 9.6 percent.[20] While there is some indication of economic recovery,[21] at least one industry—debt collection, has not only survived, but has continued to thrive through recession. From 1990 to 2007, employment in the third-party debt collection industry has more than doubled.[22] In 2007, the debt industry posted annual revenue of $57.9 billion.[23]

### A. Scope, Business Model, and Legal Strategies

In 2003, Americans had 1.46 billion credit cards, for an average of five credit cards per person.[24] These credit cards became crucial to many as the cost of living rose and real wages fell, thereby forcing low-income consumers to rely on credit cards to pay for basic living expenses.[25] By 2009, outstanding consumer loans exceeded $2.5 trillion,[26] of which debt from credit cards and other revolving debt was nearly $1 trillion at its peak,[27] with subprime credit cards constituting more than a quarter of the credit card market.[28] In short, loans that were easy to obtain initially, eventually became impossible to repay.[29]

Of course, in a difficult economy many consumers cannot repay their debt, and some simply stop doing so.[30] While creditors may initially hope to collect on the debts, after a prolonged period of non-payment, creditors "charge-off" unpaid accounts, bundle them into a portfolio, and then sell them to third-party debt buy-

---

20. News Release, U.S. Dep't of Labor, USDL-11-0129, The Employment Situation—January 2011, (Feb. 2011), *available at* http://www.bls.gov/news.release/archives/empsit02042011.pdf.

21. *See* Catherine Rampell, *Hiring is on the Rise, but Jobless Rate Remains at 9.6%*, N.Y. TIMES, Nov. 6, 2010, at A0 (reporting that the United States economy added 151,000 jobs in October).

22. *See* PWC, *Value of Third-Party Debt Collection to the U.S. Economy in 2007: Survey and Analysis*, ACA INT'L, 3 (June 12, 2008), *available at* http://www.acainternational.org/images/12546/pwc2007-final.pdf (finding that employment in the debt collection industry has risen from less than 70,000 people in 1990 to 157,000 in 2007. Based on a survey of third-party debt collectors, employment in the debt collection industry is actually closer to 217,000 in 2007. *Id.*

23. *See id.* at 2 ("total debt recovered was reported to be $57.9 billion according to a survey of third-party debt collection agencies, of which $51.9 billion represented gross collections on a commission basis.").

24. Robert J. Samuelson, *Unwinding the Credit Boom*, WASH. POST, Aug. 23, 2006, at A15.

25. WILNER & SHEFTEL-GOMES, *supra* note 4, at 3.

26. Rick Jurgens & Robert J. Hobbs, *supra* note 8, at 5.

27. *Id.*

28. *Id..*

29. *See* Jurgens & Hobbs, *supra* note 8 (noting the increasing rate at which consumers fall behind on repayment of their loans).

30. *See* David Streitfeld, *When Debtors Decide to Default*, N.Y. TIMES, Jul. 25, 2009, *available at* http://www.nytimes.com/2009/07/26/weekinreview/26streitfeld.html

holland_jci2        7/25/2011 1:19 PM

PETER A. HOLLAND

ers.[31] Given that lenders classify these charged-off accounts as worthless, debt buyers are able to purchase portfolios for pennies on the dollar.[32] Once acquiring these unpaid accounts, debt buyers attempt to collect the full outstanding balance, often by directly suing consumers in state court.[33]

Debt buying became a lucrative industry very quickly, ranking among the fastest-growing sectors of all financial services over the past decade.[34] By 2005, debt buyers were purchasing more than $110 billion in debt annually,[35] with charged-off credit card debt accounting for 91% of this amount.[36] The net income at four major debt buying firms increased by more than 700% from 2001 to 2006.[37] By the industry's own estimate, sales of charged-off consumer debt will have exceeded $86 billion by 2010.[38]

In the majority of debt buyer cases, the courts grant the debt buyer a default judgment because the consumer has failed to appear for trial.[39] In many of these instances, debtors simply do not know they have been sued.[40] Debt buyers often send notices to addresses listed in the underlying credit card accounts; however, these accounts are frequently several years old and contain outdated contact informa-

---

31.  *See* Victoria J. Haneman, *The Ethical Exploitation of the Unrepresented Consumer*, 73 MO. L. REV. 707, 713–14 (2008). Typically, a creditor will remove unpaid accounts from its balance sheet after 180 days of continued non-payment. *Id.* Creditors "charge-off" debt in order to obtain a bad-debt deduction under the Internal Revenue Code. *Id.* at 713. "'Charge off' is an accounting term for retail credit loans that have been delinquent or past due for 180 days and which the creditor treats as a loss." WILNER & SHEFTEL-GOMES, *supra* note 4, at n. 6.

32.  *Id.* at 714.

33.  *See* WILNER & SHEFTEL-GOMES, *supra* note 4, at 3 (discussing the various methods in which a debt buyer can attempt to collect the debts or pass on the debt by reselling the debt portfolio). If a debt buyer decides that collection on a particular account is either futile or unprofitable, it often sells that account to another debt buyer, who in turn may also sell the account, and so on. *Id.*

34.  *See* Michael Rezendes et al., *No Mercy for Consumers: Firms' Tactics Are One Mark of a System That Penalizes Those Who Owe*, BOSTON GLOBE, July 30, 2006, at A1 (noting that the debt collection industry has exploded since consumer debt increased due to millions of Americans' heavy reliance on credit card debt).

35.  WILNER & SHEFTEL-GOMES, *supra* note 4, at 3.

36.  *Id.*

37.  *Id.*

38.  *See* Haneman, *supra* note 31, at 715 (highlighting the significance of debt-buyers' role in the debt collection industry through the projection that sales of charged-off consumer debt will exceed $86 billion by 2010).

39.  WILNER & SHEFTEL-GOMES, *supra* note 4, at 6. In a sample of 336 debt buyer cases in New York City, researchers found that debt buyers obtained default judgments in four out of five cases (81.4%). *Id.* at 8. *See also* Russell Engler, *Out of Sight and Out of Line: The Need for Regulation of Lawyers' Negotiations with Unrepresented Poor Persons*, 85 CAL. L. REV. 79, 119 (1997) (finding that default judgment occurred in 70% to 90% of consumer cases).

40.  WILNER & SHEFTEL-GOMES, *supra* note 4, at 6.

THE ONE HUNDRED BILLION DOLLAR PROBLEM

tion.[41] In addition, many process servers simply fail to serve papers but nonetheless sign false affidavits of service with the court.[42]

Debtors who do receive notice usually appear without legal representation[43] because they either (1) cannot afford an attorney, or (2) cannot find an attorney who will take their case.[44] Indeed, an attorney's decision to represent a low-income client often depends on whether there are funds to pay for the representation.[45] The general rule of the American adversarial system states that each party will pay their own attorney's fees regardless of who is the prevailing party.[46] Thus, notwithstanding viable counterclaims, a successful defense in a debt buyer case will not produce any funds to be paid to a defense counsel.[47] As a result, consumer debtors, who lack any knowledge of their legal rights, must resort to appearing *pro se* and stumble through complex procedural and substantive legal issues that even some trained attorneys do not fully understand.[48] Many debt buyers have been known to exploit unrepre-

---

41.   *Id.*

42.   *See id.* (defining this process as "sewer service," in which the process servers file false affidavits of service with the courts instead of throwing them in the "sewer"). In *Pfau v. Forster & Garbus,* the New York Attorney General filed suit against 35 debt collection law firms and two debt collection companies that obtained more than 100,000 default judgments allegedly entered because their process server engaged in "sewer service." *Id.* (discussing Order to Show Cause, Pfau v. Forster & Garbus, No. 12009-8236 (N.Y. Sup. Ct. July 21, 2009)); *see* Velocity Invs., LLC v. McCaffrey, No. 1674/07, 2011 WL 420661, at *2 (N.Y. Dist. Ct., Feb. 2, 2011) (explaining the Pfau action and stating that it has been settled by consent order).

43.   WILNER & SHEFTEL-GOMES, *supra* note 4, at 7. In New York, for example, only 1% of defendants sued by creditors were represented by an attorney. *Id.*

44.   Haneman, *supra* note 31, at 721–24 (arguing that the typical consumer debtor's "choice" to appear and defend *pro se* is involuntary; *see* WILNER & SHEFTEL-GOMES, *supra* note 4, at 13 for a discussion of the consumer debtor as *pro se* defendant.

45.   Haneman, *supra* note 31, at 723 (noting that *pro bono* representation is also difficult to find because the public lacks sympathy for default debtors).

46.   *See, e.g.,* Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2139, 2156–57 (2010) (" 'Our basic point of reference' when considering the award of attorney's fees is the bedrock principle known as the ' American Rule:' Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.") (citing Ruckelshaus v. Sierra Club, 463 U.S. 680, 683 (1983); FED. R. CIV. P. 54(d)(2); Thomas D. Rowe, Jr., *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 4 DUKE L. J. 651, 651 (1982).

47.   Haneman, *supra* note 31, at 722. As a result, not only can many consumers not afford lawyers for these cases, but lawyers are hesitant to take them, since the cases are unlikely to cover their costs. Stewart Macaulay, *Lawyers and Consumer Protection Laws,* 14 L. AND SOC. REV 116, 129, 132–33 (1979).

48.   *See* Goldberg, *supra* note 6, 744–45. As Goldberg notes,
      "[m]ost critics agree that repeat players, like the debt-buying companies, have the upper hand over first-time users of the legal system, and consequently, have a greater chance of success. Lawsuits are foreign and intimidating for inexperienced debtors. Defendants often default, rather than appear in court, because 'they fail to understand the complaint or because they concede defeat, unaware of possible defenses. . . .'" *Id.* [D]ebt-buying companies intentionally target poor and unsophisticated debtors for the very reason that they are unlikely to understand the legal process or know what their rights are. *Id.*

PETER A. HOLLAND

sented consumers by pressuring them into unreasonable settlements,[49] by filing claims without having or being able to produce adequate proof,[50] and by ignoring legal requirements with the knowledge that the untrained consumer will fail to object.[51]

One indication of the imbalance of power is the rate of judgments against consumers—and particularly default judgments—resulting from those claims. For example, a recent study estimates that 45% of debt collection cases result in default judgments in Cook County, Illinois; another found that 80% of those in New York City do.[52] These high rates result in part because both consumers and courts simply assume that the debt allegedly owed is accurately portrayed as presented by their plaintiff, and so they fail to challenge it.[53] Debt buyers know this, and as a result, have found the use of courts to be a highly effective component of their business plan.[54]

---

It is questionable whether, under these circumstances, we can still claim to have an "adversarial" system. *See* Haneman, *supra* note 31, at 722 (internal citations omitted):

> The Anglo-American adversary system has been described as a "sporting" system of justice. Its roots lie in classical philosophy, which has long embraced debate and argument as the method of deriving truth. Truth, or at least justice where truth cannot be ascertained, is found in evidence and argument offered to a court by contending partisans . . . . An adversary system functions well enough when the knowledge and skills of both contending advocates are, if not roughly equal, then at least above some threshold level. The competent presentation of claims and defenses and the effective maneuvering through complex procedural rules rests fully on the advocates' skills and resources. As equality between them declines, so too does the system's ability to redeem the promises implicit in Lady Justice's scales. This inequality reaches its maximum when an unrepresented litigant is matched against a trained attorney. By that point the premise of the system is proven false—a failure described by the system's critics as the "adversary myth." *Id.*

49. WILNER & SHEFTEL-GOMES, *supra* note 4, at 7 (noting that debt buyers also wield significant power to freeze debtor accounts and garnish wages).

50. *Id.* at 7, 15 (finding that common practice of debt collection law firms in New York includes "seeking default judgments on the basis of false and/or legally inadequate affidavits").

51. *See* Haneman, *supra* note 31, at 708–09, 717 (discussing the practice of debt buyers filing claims known to be past the statute of limitations period).

52. U.S. GOV'T ACCOUNTABILITY OFFICE, *supra* note 2, at 41.

53. Haneman, *supra* note 31, at 709 (The debtor sees only this: an attorney (a professional licensed by the state) bringing a claim in a court (an extension of the state tasked to the cause of justice and application of the rule of law) asserting the validity of a debt. The typical consumer debtor would find it difficult to believe that a creditor's attorney could knowingly, and ethically, bring a lawsuit and obtain a judgment on an out-of-statute debt.").

54. Goldberg, *supra* note 6, at 741 (noting that debt buyers have recently turned to courts at higher rates in order to increase their rates of return on the debts, and that this strategy has been successful).

THE ONE HUNDRED BILLION DOLLAR PROBLEM

### B.  *Emerging Issues of Documentation*

Despite the assumptions of reliable documentation by courts and consumers, creditors' documentation of debt is often times far from complete[55] and indeed well below the standards demanded by state or federal rules of evidence.[56] Debt buyers often lack original credit card agreements, copies of bills or credit slips, records of payments or disputes, or even evidence that claims have been assigned to them.[57] Instead, they often have only a spreadsheet or database summarizing the hundreds or thousands of accounts they have purchased from an original creditor or intermediate debt buyer.[58] The fact of faulty documentation in the consumer market is real and substantial enough that, according to the Federal Trade Commission, judges themselves have observed repeated confusion by consumers over where a debt comes from.[59] Because of the problems of documentation, debt buyers often drop lawsuits when challenged by a consumer in small-claims court.[60]

The media has reported widely on the extent of "robo-signing" in the context of foreclosure.[61] Robo-signing refers to the practice of signing affidavits and other documents "so quickly that they could not possibly have verified the information in the document under review."[62] In Maryland, consumers and the courts discovered that lawyers at some foreclosure law firms did not sign affidavits that bore their purported signature, but instead instructed their employees to reproduce their signatures.[63] The Maryland Court of Appeals addressed the problem by approving

---

55.  A study of debt collection cases in New York found that 99% of cases reviewed in the study where default judgments were entered had inadequate proof of the debt owed. URBAN JUSTICE CENTER, DEBT WEIGHT: THE CONSUMER CREDIT CRISIS IN NEW YORK AND ITS IMPACT ON THE WORKING POOR 7, 9, October 2007, *available at* http://www.urbanjustice.org/pdf/publications/CDP_ Debt_Weight.pdf.

56.  *Id. See also infra*, Part III.

57.  *See supra* notes 10-12.

58.  WILNER & SHEFTEL-GOMES, *supra* note 4, at 22.

59.  FTC, REPAIRING A BROKEN SYSTEM: PROTECTING CONSUMERS IN DEBT COLLECTION LITIGATION AND ARBITRATION 16 (2010)[herinafter "FTC"], *available at* http://www.ftc.gov/os/2010/07/debtcollectionreport.pdf.

60.  Goldberg, *supra* note 6, at 746. The author's experience as director of the Consumer Law Clinic has been that once our student attorneys get involved, the overwhelming majority of cases are dismissed. Moreover, in the overwhelming majority of cases we have litigated, evidence of standing, liability and damages is woefully lacking.

61.  *See, e.g.* David Streitfeld, *JPMorgan Suspending Foreclosures* N.Y. TIMES, Sept. 29, 2010. "Chase and GMAC, in their zeal to process hundreds of thousands of foreclosures as quickly as possible and get those properties on the market, employed people who could sign documents so quickly they popularized a new term for them: "robo-signer." See also *infra* note 67.

62.  Gretchen Morgenson & Andrew Martin, *Big Legal Clash on Foreclosure is Taking Shape*, N.Y. TIMES, Oct. 21, 2010, at A1.

63.  Jamie Smith Hopkins, *Court OKs Review of Foreclosures in Maryland*, BALT. SUN, Oct. 20, 2010, at 1A.

PETER A. HOLLAND

emergency rules to allow the hiring of examiners to scrutinize the paperwork of fo-reclosure robo-signers.[64]

Such robo-signing practices exist in the debt collection industry as well.[65] In a New York study, researchers found that over the course of a year, one debt buyer's affiant identified himself as the custodian of records in 47,503 affidavits, thereby claiming to have personal knowledge of the facts of each and every case.[66] An em-ployee of debt collection firm Asset Acceptance said he was required to sign hun-dreds of affidavits a day, and an employee of Asta Funding, another debt buyer, said that she signed an affidavit on average every 13 seconds.[67] In one story on the televi-sion program 60 Minutes, an admitted robo-signer named Chris Pendley admitted to signing 4,000 documents per day as officer of—on average—5 different banks per day.[68] He did so as part of a group of 12 people who sat around a table and did nothing other than sign fraudulent signatures all day long, and was paid $10.00 per hour to do so.[69] In reality, he was never an officer of any bank, but rather was al-ways an employee of a company known as "DOCX."[70]

A specific example of the depth of the problem is evidenced in reports concern-ing the sale of charged-off debt by JP Morgan Chase ("Chase"). As the *New York Times* reported in 2010:

> *Linda Almonte oversaw a team of advisers, analysts and managers at JPMorgan Chase last year, when the company was preparing the sale of 23,000 delinquent accounts, with a face value of $200 million. With the debt sold at roughly 13 cents on the dollar, the sale was supposed to net $26 million.*
>
> *As the date of the sale approached, Ms. Almonte and her employees started to notice mistakes and inconsistencies in the accounts.*

---

64. Jamie Smith Hopkins, *Fannie Mae Raises Foreclosure Fees in MD*, BALT. SUN, Jan. 22, 2011, at 6A. The new Maryland Court of Appeals rules order is available at http://www.courts.state.md.us/rules/ ro-docs/ro166.pdf. *See* MD. CODE ANN., CTS. & JUD. PROC. §§ 14-207.1, 1-311, 14-207 (West 2011).

65. *See, e.g.*, WILNER & SHEFTEL-GOMES, *supra* note 4, at 14. Although debt buyers are required to provide proof of personal knowledge of the facts of the case, evidence reflects that this standard has not been enforced. *Id.*

66. *Id.*

67. David Segal, *Debt Collectors Face a Hazard: Writer's Cramp*, N.Y. TIMES, Nov. 1, 2010, at A1.

68. *60 Minutes: The Next Housing Shock* (CBS News television broadcast Apr. 3, 2011), *available at* http://www.cbsnews.com/video/watch/?id=7361572n (beginning at minute mark 6:47).

69. *Id.*

70. *Id.*

THE ONE HUNDRED BILLION DOLLAR PROBLEM

*"We found that with about 5,000 accounts there were incorrect balances, incorrect addresses," she said. "There were even cases where a consumer had won a judgment against Chase, but it was still part of the package being sold."*

*Ms. Almonte flagged the defects with her manager, but he shrugged them off, she says, and he urged her and her colleagues to complete the deal in time for the company's coming earnings report. Instead, she contacted senior legal counsel at the company. Within days, she was fired."*

*The article went on to quote one lawyer's apt analogy:*

*"I've lost four and I've taken about 5,000 cases," said Jerry Jarzombek, a consumer lawyer in Fort Worth. "If the case goes to trial, I say to the judge, 'Your honor, imagine if someone came in here to give eyewitness testimony in a traffic accident case and they didn't actually see the crash. They just read about it somewhere. Well, this is the same thing.' The debt buyers don't know anything about the debt. They just read about it.""*

*C.   In Part Because of Documentation Problems, Consumers Face the Real Threat of Being Sued Twice on the Same Debt*

Abuses in the debt buyer industry also extend to subjecting consumers to duplicative judgments on a single debt.[73] Such lawsuits are all too common, in Maryland and elsewhere.[74] Indeed, a simple Westlaw search reveals numerous examples of debt collectors attempting to recover debt that had already been paid or settled by the debtor.[75]

---

71.  Segal, *supra* note 67, at A1.

72.  *Id.* (pointing out that when a consumer is aware of the legal action, he is often successful, but that lack of notification frequently leads to default judgments).

73.  See *infra* note 93.

74.  *Id.*

75.  *See, e.g.,* Chase Bank USA, N.A. v. Cardello, 896 N.Y.S.2d 856 (N.Y. Civ. Ct., March 4, 2010) ("[O]n a regular basis this court encounters defendants being sued on the same debt by more than one creditor alleging they are the assignee of the original credit card obligation. Often these consumers have already entered into stipulations to pay off the outstanding balance due the credit card issuer and find themselves filing an order to show cause to vacate a default judgment from an unknown debt purchaser for the same obligation."); McCammon v. Bibler, Newman & Reynolds, P.A., 493 F. Supp.2d 1166, 1170 (D. Kan. 2007) (finding that a collection agency pursued former debtor for payment and obtained judgment despite knowing that former debtor had paid original creditor); Grimsley v. Messerli & Kramer, P.A., No. 08-548 (JRT/RLE), 2009 WL 928319, at *1 (D. Minn. March 31, 2009) (finding firm collecting on already paid debt); Sweatt v. Sunkidd Venture, Inc., No.

PETER A. HOLLAND

Reported cases from around the nation demonstrate that debtors face multiple collection attempts or lawsuits by competing entities—including many that lack standing. Collection attempts by firms without standing come in many varieties. Most commonly, the debtor pays Debt Buyer A, but then Debt Buyer B later attempts to collect.[76] Sometimes, the debtor pays Debt Buyer A even though Debt Buyer A had already sold the debt to Debt Buyer B without debtor notification.[77] Other times, debtors pay the original creditor prior to a debt buyer's collection attempts.[78]

There are several other ways that firms may try to collect on old debt that was already paid in full. One debt collector may attempt to collect twice on the same debt.[79] Firms may even sue each other over the right to collect a debt.[80] In any of these cases, if courts allow judgments based on inadmissible or shoddy evidence, consumers face a real threat of being sued twice on the same debt.

Based on problems such as the documentation and multiple lawsuit issues above, the federal government describes the current debt collection system as *broken*." In 2010, the federal government stated:

---

C05-5406FDB, 2006 WL 1418652, at *1 (W.D. Wash. May 18, 2006) (noting firm collecting on debt already paid); Hooper v. Capital Credit & Collection Services, Inc., No. CV 03-793-JE, 2004 WL 825619 (D. Or. Apr. 13, 2004) (finding attempted collection on debt already paid to original creditor potentially due to original creditor's bookkeeping errors); McHugh v. Check Investors, Inc., No. Civ.A. 5:02CV00106, 2003 WL 21283288, at *2 (W.D. Va. May 21, 2003) (finding that former debtor had paid debt before collection agency ever began collection attempts).

76.   *See, e.g.,* Overcash v. United Abstract Grp., Inc., 549 F.Supp.2d 193, 195 (N.D.N.Y. 2008) (finding that former debtor-paid collection agency, but debt was subsequently sold and resold multiple times before another collection firm presented former debtor with bill roughly $40,000 larger than the paid, settled amount); Chiverton v. Fed. Fin. Grp., Inc., 399 F.Supp.2d 96, 99–100 (D. Conn. 2005) (determining that former debtor paid one collection agency, but another firm later claimed that it had bought the debt and made multiple threatening and harassing phone calls to the former debtor); Fontana v. C. Barry & Assocs., LLC, No. 06-CV-359A, 2007 WL 2580490, at *1 (W.D. N.Y. Sept. 4, 2007).

77.   *See, e.g.,* Smith v. Mallick, 514 F.3d 48, 50 (D.C. Cir. 2008) (explaining how one debt buyer had another debt buyer reassign a judgment to him after he heard the other debt buyer was no longer trying to collect, without notifying the debtor or the debtor's counsel of the reassignment).

78.   *See, e.g.,* Assocs. Fin. Servs. Co. v. Bowman, Heintz, Boscia & Vician, P.C., IP 99-1725-C-M/S, 2001 U.S. Dist. LEXIS 7874, at *9–12 (S.D. Ind. April 25, 2001), later opinion, 2004 U.S. Dist. LEXIS 6520, at *5–9 (S.D. Ind. Mar. 31, 2004) (finding some debts placed for collection were paid or already assigned to another collector).

79.   *See* Capital Credit & Collection Serv., Inc. v. Armani, 206 P.3d 1114, 1116–18 (Or. Ct. App. 2009) (finding that debt collector settled a debt and then instituted litigation on the same debt).

80.   *See* Wood v. M&J Recovery LLC, CV 05-5564, 2007 U.S. Dist. LEXIS 24157, at *1 (E.D. N.Y. Apr. 2, 2007) (featuring four different firms filing cross claims against one another for right to collect one particular debt).

THE ONE HUNDRED BILLION DOLLAR PROBLEM

> *Based on its extensive analysis, the Federal Trade Commission ("FTC" or "Commission"), the nation's consumer protection agency, concludes that* neither litigation nor arbitration currently provides adequate protection for consumers. The system for resolving disputes about consumer debts is broken. . . because consumers are not adequately protected in either debt collection litigation or arbitration.["]

### III. THE NEED TO DEMAND STRICTER PROOF

The lack of reliable proof from creditors and debt buyers calls out for a solution. While it is understandable that there are good policy reasons why the rules of evidence should not always apply in small claims cases, it is equally clear that in the debt buyer context, "small claims courts" have in reality become "creditor's courts," devoid of the hallmark characteristics of an adversary system. In a market economy, when there is no competition, costs rise and quality falls. Similarly, in an adversary system, when there is no competition in the form of an advocate to represent the consumer, the costs to the consumer rise and the quality of justice falls.

#### A.    The Role of the Debt Buyer's "Business Records" and Maryland's Jurisprudence on Business Records

In order to prove a proper chain of title, an underlying contract, or the amount of damages owed, the purchaser of charged-off debt needs to consult documents and records that were generated by the original creditor and by each intermediary debt buyer. In order to prove their case, debt buyers usually attempt to introduce these hearsay documents with little or no foundation as to personal knowledge.["]

In order to prove a valid case, the debt buyer needs to convince the court that there was an underlying debt (typically based on an underlying contract), that there was a default, that there was an amount certain due and owing, and that there is a complete chain of assignment from the original creditor to the current debt buyer. Because each of these elements is hearsay (assuming the rules of evidence apply), the debt buyer attempts to authenticate all documents and the statements made in those documents as if they were the debt buyer's own business records; as if the debt buyer itself had generated the documents.["] Frequently the debt buyer will attempt to offer this hearsay through the Rule 803(b)(6) "Business Records Exception"["] or

---

81.    FTC, *supra* note 59, at 1, 71 (emphasis added).

82.    There are frequently other problems such as lack of authenticity, lack of completeness, and altered documents, to name a few.

83.    *See infra* note 106.

84.    Maryland follows the Federal Rules and most states in its Rule 5-803(b)(6):

PETER A. HOLLAND

its small claims court equivalent: "when we bought the account, we bought the pa-
perwork to prove the account, and they are all a part of our records now, and we
know that the information is reliable and accurate."[85]

Although the rules of evidence do not apply in small claims cases, their require-
ments are instructive, because, like all testimony offered under oath in a court of
law, central to the business records exception is the requirement of *personal know-
ledge*.[86] And, like witness testimony in general, business records should be excluded
"if the source of information or the method or circumstances of the preparation of
the record indicate that the information in the record lacks trustworthiness."[87]

Maryland courts have refused to admit business records if the party seeking ad-
mission cannot produce a live witness or affiant with personal knowledge to verify
the manner in which the documents were made.[88] In *Bernadyn v. State*,[89] the State
sought to use a medical bill seized during a search warrant to establish the defen-
dant's address.[90] The defendant objected to admissibility of the bill because of the
lack of foundation laid for the business record exception to the hearsay rule.[91] The
Court of Appeals granted certiorari on the issue of introduction of evidence without
foundation or authentication under any exception to the hearsay rule.[92] In finding

---

To include evidence under the business records exception, a party must show that the records meet
certain basic requirements: (1) the records must have been made at or near the time of the events
that they concern; (2) they must have been made by a person with personal knowledge of the in-
formation described; (3) they must have been made in the course of regularly conducted business
activity; and (4) the regular practice of the business must be to make and keep the records. MD. R.
EVID. 5-803(b)(6).

85.   *See infra* note 106.
86.   *Id.*
87.   MD. R. EVID. 5-803(b)(6).
88.   *See infra* notes 77–84 and accompanying text. *See also* MD. CODE ANN., MD. R. EVID. § 5-803(b)(6)
(West 2011) (stating that a record of regularly conducted business activity may be admissible as an exception to
the hearsay rule if, among other things, "it was made by a person with knowledge or from information trans-
mitted by a person with knowledge" at or near the time of the event, but that such a record "may be excluded if
the source of information or the method or circumstances of the preparation of the record indicate that the
information in the record lacks trustworthiness").
89.   887 A.2d 602 (Md. 2005).
90.   *Id.* at 603. The State argued that because the address on the letter was the product of nonassertive con-
duct it was not a statement, therefore the hearsay rule did not apply. *Id.* at 606.
91.   *Id.* at 606 ("[Defendant] reasons that the bill is hearsay because it was an out-of-court statement of-
fered for its truth and that the State failed to establish that the statement satisfied any exception to the hearsay
rule. He contends that the sender's conduct of addressing a letter is an implied assertion and is thus hearsay. In
the alternative, he argues that even if the bill is admissible under the business record exception, the State failed
to lay a proper foundation for that exception.").
92.   *Id.*

HOLLAND_jci2 (Do Not Delete)                                                    7/25/2011 1:19 PM

THE ONE HUNDRED BILLION DOLLAR PROBLEM

the document inadmissibly hearsay, the Court drew parallels to *Collins v. Kibort*,[93] where the Seventh Circuit found that, although medical bills are admissible as business records under Federal Rule of Evidence 803(6), the proponent of the evidence must establish a proper foundation as to their reliability.[94] Discussing *Collins*, the Maryland Court of Appeals [the *Bernadyn* Court] held that:

> [A]lthough the [Collins Court] did not doubt that the hospital maintains its bills in the course of its regularly conducted activity and that it was part of the hospital's regular business practice to create and maintain its bills, "the business record exception does require that the witness have knowledge of the procedure under which the records were created." Collins was not qualified to testify about the reliability of the medical bills because he knew nothing about the billing practices of the hospital.[95]

As in *Collins*, the Maryland Court of Appeals in *Bernadyn* found that the statements contained in the medical bill were inadmissible hearsay because the state failed to establish a foundation for the business records exception to the hearsay rule by presenting evidence regarding the billing practices of the medical provider and the source of the name and address on the medical bill.[96]

---

93. 143 F.3d 331, 337–38 (7th Cir. 1998) (holding that an employee suing his employer and supervisor under a race discrimination claim could testify about his medical condition but could not testify about his medical bills because he could not establish sufficient foundational evidence to satisfy the hearsay exception for business records when he did not have knowledge of the procedures under which the records were created).

94. *Id.* at 337. The Collins Court explained,
   "[a] proper foundation is established if the party attempting to admit the evidence demonstrates that the business records 'are kept in the course of regularly conducted business activity, and [that it] was the regular practice of that business activity to make records, as shown by the testimony of the custodian or otherwise qualified witness.'" *Id.* (citation omitted).

95. *Bernadyn*, 887 A.2d at 615 (emphasis added) (citing and quoting *Collins*, 143 F.3d at 338).

96. *Id.* Maryland courts have also required personal knowledge in affidavits outside the context of the business records exception to the hearsay rule. *See, e.g.*, Mercier v. O'Neill Assocs., Inc., 239 A.2d 564, 564–65 n.1 (Md. 1968) (finding affidavit lacking personal knowledge insufficient under Rule 2-501 to sustain the trial court's granting of summary judgment in contract payment dispute); White v. Friel, 123 A.2d 303, 305 (Md. 1965) (finding affidavits lacking personal knowledge deficient under Summary Judgment Rule 2 in the case of a creditor seeking to recover on debtor's open account, and so summary judgment was improper based on the uncertainties of the case); Fletcher v. Flournoy, 81 A.2d 232, 234 (Md. 1951) (disregarding affidavit filed by defendant, "made by himself, 'to the best of his knowledge, information and belief'" in the case of a property owner seeking for possession and damages from defendant property possessors (citing State of Wash. v. Maricopa Cnty., 143 F.2d 871, 872 (9th Cir. 1944))).

PETER A. HOLLAND

*B. Other States' Jurisprudence on Business Records*

Other states have also held that business records may only be authenticated by a witness with personal knowledge of the record keeping practices of the business that created and maintained the document.

New York courts have repeatedly pointed to the importance of holding businesses to the standards of Rule 803(6), including in its recent credit card debt collection cases involving Chase Bank. In *Chase Bank USA, N.A. v. Hershkovits*,[97] a lower court noted that "[w]ith respect to the foundation testimony . . . someone with personal knowledge of the business's record making practices and procedures must lay the requisite foundation" and "the sponsoring witness should display some familiarity with the record at issue before the item is admitted into evidence."[98] Again, in *Chase Bank USA, N.A. v. Cardello*,[99] the court emphasized the importance of this standard given problems in the industry:

> [O]n a regular basis this court encounters defendants being sued on the same debt by more than one creditor alleging they are the assignee of the original credit card obligation. Often these consumers have already entered into stipulations to pay off the outstanding balance due the credit card issuer and find themselves filing an order to show cause to vacate a default judgment from an unknown debt purchaser for the same obligation.[100]

---

97. No. CV-062213-09 (N.Y. Civ. Ct. June 22, 2010) (breach of contract and debt recovery action against pro se defendant).
98. *Id.* at 3–4.
99. 896 N.Y.S.2d 856 (N.Y. Civ. Ct. 2010) (debt collection action by judgment creditor's intended assignee).
100. *Id.* at 857; *see also* DNS Equity Group Inc. v. Lavallee, Civ. 12388/09 (S.D.N.Y Feb. 22, 2010) (where Plaintiff's agent based her affidavit upon documentation provided by the original creditor and did not have personal knowledge of the original creditor's business practices, finding proof insufficient to establish a proper foundation for the account agreement and account statements; "Submission of the underlying statements, in proper evidentiary form, is required in assigned debt cases, like this one."); Palisades Collection, LLC v. Kedik, 890 N.Y.S.2d 230, 230 (N.Y. App. Div. 2009)) ("Here, plaintiff submitted an affidavit from its agent with exhibits, including a printed copy of several pages from an electronic spreadsheet listing defendant's Discover account as one of the accounts sold to plaintiff. Contrary to the contention of plaintiff, the court properly determined that it failed to establish a proper foundation for the admission of the spreadsheet under the business record exception to the hearsay rule."); *see also* PRA III, LLC v. Gonzalez, 864 N.Y.S.2d 140 (N.Y. App. Div. 2008) (overruling summary judgment based on inconsistent documents concerning defendant's debt and reinstating counterclaim for filing of false affidavits by plaintiff creditor); West Valley Fire District No. 1 v. Village of Springville, 743 N.Y.S.2d 215, 216 (N.Y. App. Div. 2002) ("A proper foundation for the admission of a business record must be provided by someone with personal knowledge of the maker's business practices and procedures.").

HOLLAND_jci2 (DO NOT DELETE)                 7/25/2011 1:19 PM

### THE ONE HUNDRED BILLION DOLLAR PROBLEM

Along these lines, courts in New York and elsewhere have noted particular problems where debts are assigned from an original owner to a buyer. In *Rushmore Recoveries X, LLC v. Skolnick*,[101] a lower court found that a plaintiff's witness' familiarity with the business records derived only from "the documents and records ostensibly created by Citibank, and/or assignees who have preceded the Plaintiff," and because he "merely obtained the records from another entity that actually generated them."[102] Therefore his statements were "an insufficient foundation for [the business records'] introduction into evidence:"[103]

> *The repetitive statements of . . . the Plaintiff's custodian of records, to the effect that he collects and maintains the records and documents of [the original creditor] and/or any other prior assignees, 'in the regular course of plaintiff's business,' as if they were magic words, does not satisfy the business records exception to the hearsay rule. That phrase, standing alone, does not establish that the records upon which the Plaintiff relies were made in the regular course of the Plaintiff's business, that it was part of the regular course of the Plaintiff's business to make such records, or that the records were made at or about the time of the transactions recorded.*[104]

In Missouri, an intermediate appellate court has, on at least three occasions, rejected a debt buyer's custodian of records' attempt to attest to the identity and mode of preparation of documents created by an assignor. In *Asset Acceptance v. Lodge*,[105] the court noted that "Asset did not prepare the documents in question, but rather only received the documents from HSBC and held them in their files. [The witness] was not qualified to testify regarding documents not prepared by Asset. Thus, the documents do not fall under the business records exception."[106] Similarly,

---

101.   No. 21161/05 (N.Y. Dist. Ct. May 24, 2007) (debt purchaser assignee collection action).

102.   *Id.* at 1–2 (N.Y. Dist. Ct. May 24, 2007).

103.   *Id.* at 2 (citations omitted).

104.   *Id.* (citations omitted). *See also* Insurance Company of North America v. Gottlieb, 588 N.Y.S.2d 571 (N.Y. App. Div. 1992) ("Testimony of plaintiff's agent who merely obtained records from another entity that generated them was insufficient foundation for admitting the records under the business records exception to the hearsay rule"); Standard Textile Co. v. National Equipment Rental, Ltd., 80 A.D.2d 911, 911 (N.Y. App. Div. 1981) ("[T]he mere filing of papers received from other entities, even if they are retained in the regular course of business, is insufficient to qualify the documents as business records," and so plaintiff's employee "was not a qualified witness to testify as to the record keeping of another entity");PRA III, LLC v. MacDowell, 841 N.Y.S.2d 822, 822 (N.Y. Civ. Ct. 2007) (finding that debt collector's affiant is "not an employee of the original creditor (Sears) and cannot authenticate documents from another business").

105.   325 S.W.3d 525 (Mo. Ct. App. 2010) (breach of contract claim by loan holder's assignee).

106.   *Id.* at 529.

holland_jci2                                                        7/25/2011 1:19 PM

PETER A. HOLLAND

in *C & W Asset Acquisition, LLC v. Somogyi*,[107] the court emphasized the need for personal knowledge: "[W]e fail to see how [the witness] can attest to the identity and the mode of preparation of these particular documents given that they were created by MBNA, a company that [the witness] neither works for, nor mentions in her affidavit."[108] And in *Zundel v. Bommarito*,[109] the court stressed the need for business records to actually follow reliable practices: "Where the status of the evidence indicates it was prepared elsewhere and was merely received and held in a file but was not made in the ordinary course of the holder's business it is inadmissible and not within a business record exception to the hearsay rule."[110]

Other states have taken a similar approach. In Vermont, a trial court found in *Unifund CCR Partners v. Bonfigli*[111] that the plaintiff's custodian of records was not qualified to testify about the original creditor's business practices because "there was no evidence that he was ever employed by Chase [the original creditor] or that he had personal knowledge of Chase's internal business practices."[112] The court stated that "Unifund itself cannot satisfy the requirements of the business record rule" because "[w]hile the current records are a part of Unifund's business records, and therefore meet the business records exception to the hearsay rule, the Chase data incorporated in those records is itself hearsay.[113] The court did not find the testimony reliable or credible because the affiant "did not explain how he was so familiar with Chase's business practices, whether he had ever worked at Chase, whether he has ever sat down with Chase to watch how they entered the data, whether he had ever checked the reliability of the entries, and so forth."[114] The court concluded: "something more is required than merely by saying 'we got it from them, so it must be true.' There must be some assurance that the underlying records were reliable to begin with."[115]

---

107.   136 S.W.3d 134 (Mo. Ct. App. 2004) (debt collection action by credit card assignee against cardholder).

108.   *Id.* at 139. The assignee attempted to admit into evidence an affidavit by an employee, a copy of a letter the Defendant received from the assignee, and a copy of the Defendant's signed credit agreement with the original credit card holder, among else. *Id.* at 136 n.2.

109.   778 S.W. 2d 954 (Mo. Ct. App. 1989) (action against defendant's estate to collect in quantum meruit upon claim of oral partnership).

110.   *Id.* at 958.

111.   No. S1295-08, 2010 WL 2259136 (Vt. Super. Ct. May 5, 2010) (debt purchaser's credit card debt collection action based on original creditor's electronic data, spreadsheets).

112.   *Id.* at *4.

113.   *Id.* at *6 (emphasis in original).

114.   *Id.* at *7–8.

115.   *Id.* at *12.

THE ONE HUNDRED BILLION DOLLAR PROBLEM

Similarly, in *Palisades Collection, LLC v. Kalal*, [116] a Wisconsin intermediate appellate court determined that

> *"[t]he only reasonable reading of [the statutory business records evidence] language*[117] *is that a testifying custodian must be qualified to testify that the records (1) were made at or near the time by, or from information transmitted by, a person with knowledge; and (2) that this was done in the course of a regularly conducted activity."*[118] *Therefore, "[i]n order to be qualified to testify on these two points, [the witness] must have personal knowledge of how the account statements were prepared and that they were prepared in the ordinary course of [the original creditor's] business."*[119]

In Texas, courts have asserted the same principle. In *Riddle v. Unifund CCR Partners*, [120] an intermediate appellate court stated that "[a]lthough Rule 803(6) does not require the predicate witness to be the record's creator or have personal knowledge of the content of the record; however, the witness must have personal knowledge of the manner in which the records were prepared."[121] And in *Martinez v. Midland Credit Management, Inc.,*[122] an appellate court held that the debt buyer's records were inadmissible as business records because its "affiant does not provide any information that would indicate that he (or she) is qualified to testify as to the

116.    781 N.W.2d 503 (Wis. Ct. App. 2010) (debt purchaser's credit card debt collection action).

117.    Similar to Maryland, Wisconsin law requires that a "custodian of record or other qualified witness" testify to the business records before admission into evidence. *Compare* WIS. STAT. § 908.03(6) (2011) *with* MD. RULE 5-803(b)(6) (2011).

118.    *Kalal*, 781 N.W.2d at 509.

119.    *Id.* at 510. *See also* Berg-Zimmer & Assocs., Inc. v. Central Mfg. Corp., 434 N.W.2d 834, 838 (Wis. Ct. App. 1988) (finding that although a witness may be qualified to testify that the records were created in the course of regularly conducted activity, the witness must have personal knowledge about the record's creation and may not testify about documents given to him by a third party under the business records exception to the hearsay rule).

120.    298 S.W.3d 780 (Tex. App. 2009) (debt purchaser's credit card debt collection action based on original creditor's documentation).

121.    *Id.* at 782–83 (citing *In re* K.C.P., 142 S.W.3d 574, 578 (Tex. App. 2004)). *But see* Simien v. Unifund CCR Partners, 321 S.W.3d 235, 240–44 (Tex. App. 2010) (holding credit card issuer's documents admissible under business records exception to state hearsay rule based on debt purchaser employee's testimony that he had reviewed and was the agent for the documents and had personal knowledge of the books and records concerning the claim, despite his inability to confirm the accuracy of the balance due, based on three-factor analysis).

122.    250 S.W.3d 481 (Tex. App. 2008) (subsequent debt holder's debt collection action based on original creditor's computer-generated documentation).

PETER A. HOLLAND

record-keeping practices of the 'predecessor.'"[123] This does not apply where a debt buyer's employee testifies about practices of another company with whose practices he or she is unfamiliar.[124]

Finally, in Pennsylvania a state appellate court recently upheld a trial court's finding that a debt buyer's employee did not have sufficient knowledge of the original owner's practices to testify as to their reliability and thus enter them into evidence. Quoting the trial court, an intermediate appellate court in *Commonwealth Financial Systems v. Smith*[125] noted that:

> [t]he limits of Mr. Venditti's knowledge were vast. He could offer no clear response as to whether the 1996-1997 Citibank Card Agreement . . . applied to [Ms. Smith's account]. . . . Mr. Venditti could not say for certain whether [industry] requirements had actually been followed in the preparation and maintenance of those records because, simply put, he was never in a position to know.[126]

Again, then, in a large claim, *personal knowledge* is needed to prove the basic elements of a debt buyer case. It is suggested that the same standard should apply in a small claim where the formal rules of evidence do not apply, but where the rules of relevance, prejudice, veracity and reliability always apply.

It is worth noting that in Illinois, a state appellate court took a slightly different but related approach in *Unifund v. Shah*[127] to find that an affidavit stating that a debt had been assigned from one collector to another was not enough to prove the right to pursue a claim under state law.[128] In addition, the court emphasized the overarching goal of the statute of protecting consumers:

> The possibility that debtors might be sued by a party who does not have a legal interest in their debt is a real danger, and the legislature has chosen to address this problem by demanding strict proof of an account's chain of title before an action may commence to collect on that account.[129]

---

123. *Id.* at 485.
124. *Id.*
125. 2011 PA Super 30 (Pa. Super. Ct. 2011).
126. *Id.* at *6.
127. No. 1-10-0855, 2011 WL 477725 (Il. App. Ct. Feb. 1, 2011).
128. *Id.* at 7.
129. *Id.* (citations omitted).

HOLLAND_jci2 (DO NOT DELETE)                                                                    7/25/2011 1:19 PM

THE ONE HUNDRED BILLION DOLLAR PROBLEM

Overall, these cases show that, the fact that a debt buyer's employee purports to be the custodian of records does not mean he or she is "qualified" to certify the business records if there is no demonstrated familiarity with how these types of records are prepared or maintained.[130] A debt buyer's employee is not an employee of the businesses that purportedly created the documents.[131] As the mere recipient of documents, she acquires no personal knowledge of the business records of any other entity.[132] Additionally, "the mere filing of papers received from other entities, even if they are retained in the regular course of business, is insufficient to qualify the documents as business records."[133] Indeed, one authoritative treatise has described the law as follows: "[a] debt buyer's affidavit has no probative value when the affiant's claimed familiarity with the assignor's business records is derived solely from the affiant's review of those records after they came into the debt buyer's possession."[134]

C.  *Despite the Importance of the Business Records Exception, Courts Do Not Enforce It in Small Claims Court*

The Business Records Exception to the hearsay rule provides a rigorous way to establish the reliability of hearsay records introduced as evidence.  But because the formal rules of evidence do not apply in small claims courts, rank hearsay is often admitted into evidence.  As noted above, debt buyers know and take advantage of this fact.  Given the already-disadvantaged position of unrepresented litigants relative to debt buyers, the pursuit of poorly documented debt without regard evidentiary standards in small claims courts has been nothing short of catastrophic for the consumers, and nothing short of overwhelming for the court system.[135]

The cases outlined above show that many courts outside the small claims context have indeed applied the rules of evidence to debt cases,[136] particularly in recent years, as the abuses and problems of documentation among the debt collection and

---

130.  *See supra* notes 106–181 and accompanying text.

131.  *See, e.g.*, Palisades Collection, LLC v. Kalal, 781 N.W.2d  503, 510 (Wis. Ct. App. 2010) (concluding that debt buyer's employee lacks personal knowledge of how documents, bank account statements, were prepared in the ordinary course of original debt holder's business).

132.  *See id.*

133.  Standard Textile Co. v. Nat'l Equip. Rental, Ltd., 437 N.Y.S.2d 398, 398 (N.Y. App. Div. 1981) (holding that plaintiff's employee "was not a qualified witness to testify as to the record keeping of another entity" absent personal knowledge of the document's creation).

134.  NATIONAL CONSUMER LAW CENTER, COLLECTION ACTIONS 45 (1st ed. 2008 & Supp. 2010).

135.  As one court recently noted, "The possibility that debtors might be sued by a party who does not have a legal interest in their debt is a real danger." *See, e.g., Randolph v. Crown Asset Management, LLC*, 254 F.R.D. 513 (N.D.Ill.2008) (certifying a class of at least 341 potential plaintiffs in a class action lawsuit against a defendant who attempted to collect debts that it allegedly did not own)."

136.  *See supra* notes 98 through 134 and accompanying text.

holland_jci2                                                          7/25/2011 1:19 PM

PETER A. HOLLAND

buying industries have come to light.[137]  However, there is also evidence that in many cases these rules are not applied.  For example, in the mortgage context, where debt is frequently sold to or serviced by banks other than the originator of the mortgage, a study by Katherine Porter found that over 40 percent of all claims for mortgage debt in bankruptcy proceedings were not substantiated by the most basic of all documentation: the note establishing that debt is owed.[138]  Another 16 percent of all claims had no documentation at all.[139]  Nonetheless, despite the lack of documentation, Professor Porter found that of a total of 17,333 bankruptcy proceedings she examined, only 4 percent included a challenge to the creditor's claims.[140]  Moreover, this occurred in the context of an accompanying finding that in over 95 percent of cases, there were discrepancies between the amount of debt asserted by the debtor and the creditor, with the creditor usually asserting a larger debt.[141]

Consumers are even less well-protected in small claims courts where the rules of evidence don't apply.[142]  But small claims courts are where the vast majority of debt collection cases are litigated, and in light of the shoddy documentation typically offered by debt buyers, this now-established system for pursuing consumer debt collections is, in the words of the Federal Trade Commission, "broken."[143]  If compliance with the formal rules of evidence is not required in small claims cases, then what standard should apply, when all the data is telling us that the companies pursuing these claims have very little proof and often even less concern about the legitimacy of their claims against consumers?  It is suggested that a more stringent application by judges of the *personal knowledge* requirement is likely enough to solve the problem.  If one has no personal knowledge of the facts and figures underlying the claim, then proof of that claim is difficult if not impossible.

### D.  Access to Justice

As many scholars have observed, the lax procedures in small claims courts implicate questions of power and access to justice.[144]  These questions are especially acute in

---

137.  *See supra* Parts I and II.

138.  Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 TEX. L. REV. 121, 147 (2008).

139.  *Id.* at 146.

140.  *Id.* at 168.

141.  *Id.* at 162.

142.  MD. R. EVID. 5-101 (state rules of evidence do not apply to small claims actions under Rule 3-701); MD. R. 3-701 ("The court shall conduct the trial of a small claim action in an informal manner. Title 5 of these rules does not apply to proceedings under this Rule.").

143.  *See supra* note 60.

144.  *See* Goldberg *supra* note 51, and Haneman *supra* note 31.

HOLLAND_jci2 (DO NOT DELETE)                                                    7/25/2011 1:19 PM

THE ONE HUNDRED BILLION DOLLAR PROBLEM

debt buyer cases. Over thirty-five years ago, Marc Galanter argued that courts in general favor "repeat players" in the legal system, such as debt collectors, because they have additional experience with the judicial process, access to experts at relatively low additional costs, informal relationships with court players, "credibility as a combatant," and the ability to play the odds in the long-term in order to maximize the chances of winning over time.[145] In addition, repeat players can influence the adoption of rules through legislative change and through repeat arguments to the courts.[146] As a result, the rules tend to favor repeat players.[147] The small claims context seems to bear out Galanter's argument, in that the *lack* of rules regarding evidence very much favors creditors, who, until very recently, have enjoyed the trust of the courts and thus have been able to steamroll debtors. The long term impact of the robo-signing scandals on this established trust and credibility remains to be seen. And, because debtors rarely have the experience or knowledge necessary to challenge creditors in court effectively, they often lose when they do challenge the debt buyer in court. Without lawyers to represent them, consumers are unlikely to tap into the knowledge and power necessary to change that dynamic.

More recently, Russell Engler found that prohibitions against giving advice to unrepresented litigants[148] are routinely violated, particularly in consumer contexts such as landlord/tenant or debtor/creditor disputes.[149] Instead, lawyers representing debt collectors induce debtors to agree to settlements that run roughshod over their rights, including to default judgments because an attorney advised them not to appear in court.[150]

The ultimate consequences of not enforcing the requirements of the business records exception are evident in recent litigation concerning debt buyer Palisades, which used affidavits to collect debt through small-claims courts.[151] A recent deposition shows the sloppiness with which those affidavits were created:

> Lawyer: *What's your job there (at Palisades)?*
> Witness: *I execute affidavits. . .*
> Lawyer: *. . . is there any quota or performance goal for the number of affidavits you have to execute?*
> Witness: *No, there's no quota.*

---

145.  Marc Galanter, *Why the "Haves" Come Out Ahead: Speculations on the Limits of Legal Change*, 9 LAW & SOC. REV. I, 85, 98–100 (1974).

146.  *Id.*

147.  *Id.*

148.  *See* MODEL RULES OF PROF'L CONDUCT R. 4.3 cmt. (1983).

149.  Russell Engler, *Out of Sight and Out of Line: The Need for Regulation of Lawyers' Negotiations with Unrepresented Poor Persons*, 85 CAL. L. REV. 79, 118–22 (1997).

150.  *Id.* at 119–20.

151.  *Palisades v. Wagy*, CV 2007-10652 (D.N.M. 2007).

PETER A. HOLLAND

*Lawyer: How many are you expected to execute?*
*Witness: At least 2,000.*
*Lawyer: 2,000 over what period of time?*
*Witness: Per day.*
*Lawyer: So you personally execute roughly 2,000 affidavits a day?*
*Witness: Well, not every day, but most of the time that's what our quota is. .*
*. .*
*Lawyer: Okay.  Do you actually prepare the affidavit?*
*Witness: No.*
*Lawyer: Who prepares the affidavits?*
*Witness: I don't know. . . .*
*Lawyer:  Do you have any knowledge as to where that information actually
came from that got into the computer system?—Omit objection—*
*Witness: No.[152]*

E.    *In Light of the Fact That the Debt Collection System is "Broken," It Is Essential to
Require Personal Knowledge of Affiants or Testifying Witnesses*

Approaching debt collection cases by enforcing a strict requirement of *personal
knowledge* of the debts being collected and the business records which underlie
those debts would solve many of the problems outlined in Part II.[153] It would re-
quire the debt collection and debt buying industries to adopt more reliable practic-
es, keep debt buyers and other collectors from exploiting the courts to bully con-
sumers, eliminate many of the suspicious debts currently in court, and address the
problem of multiple and competing attempts to collect the same debt.

First, requiring debt buyers to provide sufficiently documented proof of a con-
sumer's debt would quickly incentivize those buying the debt to insist on better do-
cumentation from original creditors and others from whom they purchase the debt.
As the FTC and others have observed, documentation practices are poor, and debt
buyers themselves have acknowledged as much.[154]  Currently, however, debt buyers
do not have any reason to improve their practices. Debt buyers purchase debts for
pennies on the dollar and therefore do not have the financial incentive to invest
funds into verifying the validity of these debts.[155] Additionally, as noted above, veri-

---

152.  Aff. of Cherie Thomas, *Palisades v. Wagy*, CV 2007-10652 (D.N.M. 2007), P. 5 L 21 – L. 22, P. 8 L. 2 –
L. 13 P. 10 L. 10-21 P. 34 L. 21 – P. 35 L. 1.  Deposition is on file with the author.
153.  *See supra* Part II.
154.  *See supra* notes 10-12 and accompanying text.
155.  *See supra* Part II.A.

HOLLAND_jci2 (DO NOT DELETE)                                                    7/25/2011 1:19 PM

THE ONE HUNDRED BILLION DOLLAR PROBLEM

fication of these documents is economically unnecessary because debt buyers obtain default judgments in the vast majority of their cases.[156]

If courts were to insist on requiring adequate documentation of a debt in order to enforce it, consumers would be better protected, court dockets would be less crowded, and our quality of justice would improve. For example, if courts began using a simple checklist as a screening device, they could quickly weed out cases which lacked sufficient proof of standing. In this context, debt buyers would likely improve their practices quickly and insist on more reliable documentation from those who sell them debt. The cost would likely rise.

Enforcing stricter standards for verifying purchased debt would also mitigate the problem of duplicative collection efforts. Again, if a debt buyer were unable to successfully collect from a consumer based on untrustworthy documents, he or she would be less likely to file a claim against a debtor in the first place, thus keeping "bad" claims out of court. Moreover, even if a debt buyer did attempt to collect, if courts were better able to sort out proven claims from those without documentation, they would be able to keep pseudo-creditors from asserting debts that they do not actually own. Thus, consumers would be better protected unless and until a true owner of the debt sought to collect from the consumer at a later point in time.[157] As indicated above, duplicative lawsuits on a single debt are common in the debt collection industry. Allowing debt buyers to sue and introduce documents without laying the proper foundation of personal knowledge only increases the risk of such duplicative judgments. Without indicia of trustworthiness and reliability of an original creditor's and each intervening debt buyer's record keeping practices, it is impossible for a court to tell whether a debt buyer's records contain potential or actual errors. Insisting on such proof, though, would give consumers and courts a powerful tool for avoiding error.

Of course, enforcing existing standards for *personal knowledge* would require more preparation and due diligence on the part of debt buyers, but it would not be requiring of them any more than is required of other individuals and industries. Put simply, people are not supposed to be allowed to testify about things they have no knowledge of. This is true whether the rules of evidence apply, or not, because even in small claims actions, witnesses are sworn to tell the truth. Further, given the well-documented problems in the debt buyer industry,[158] meeting the minimal standards of personal knowledge and documentation based on personal knowledge

---

156.  *See supra* Part II.A.

157.  "It has long been recognized in [Maryland] that when a maker of a note pays the debt to someone who does not have possession of the note, such payment is no defense to an action by the holder of the note." Jackson, PR of the Estate of Saunders v. 2109 Brandywine LLC, 952 A.2d 304, 320 (Md. Ct. Spec. App. 2008).

158.  *See supra* Parts I and II.

PETER A. HOLLAND

hardly seems unwarranted. It is past time to make the debt buyer industry play by the same rules that all other litigants are forced to play by.

*F. Due Process*

The current "broken" system denies access to justice for some of our citizens. In addition, however, this broken system threatens core issues of due process for all. As the Supreme Court found thirty years ago in *Mathews v. Eldridge*,[159] "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."[160] Courts may not affirmatively deprive consumers of their property without providing due process of law. It is proposed that neither may they do so by failing to uphold basic principles of due process: the entity that allegedly purchased a consumer's debt must be able to prove ownership, liability and damages, based on reliable, relevant personal knowledge.

As it stands, the general dictate of "informality" in small claims proceedings does not provide much guidance as to what thresholds apply to evidence in small claims courts—but certainly taking an oath to tell the truth, as all witnesses do, means that one can only offer evidence that is based on personal knowledge. If small claims courts are to regain control over their dockets, protect the public and continue to ensure the integrity of our system, then they must restore one of the basic tenets of due process: a witness should not be allowed to swear to the truth of facts when the witness has no personal knowledge of those facts.

## IV. CONCLUSION

To protect consumer debtors and ensure that small claims courts are not used by debt buyers to obtain bogus judgments, courts must redouble their efforts to make sure that the proponent has *personal knowledge* of the matter at issue before any person testifies, before any affidavit is accepted, and before any documents are admitted into evidence. Relaxed evidentiary standards do not mean *no* standards. The fact that the formal rules of evidence do not apply does not mean that *no* rules of evidence apply. To protect the integrity of our courts, to restore faith in due process, and to fix the system which the Federal Trade Commission describes as "broken," judges around the country need to reestablish order in the court by enforcing the basic touchstone of all adversarial proceedings: the requirement that the evidence offered be based on personal knowledge. Absent this personal knowledge

---

159.    424 U.S. 319 (1976).
160.    *Id.* at 332.

THE ONE HUNDRED BILLION DOLLAR PROBLEM

requirement, consumers, courts and society are vulnerable to the continuing barrage of shoddy debt buyer lawsuits and uneven justice.