**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BONNIE WEBB and ANGELA FULLER f/k/a ANGELA GRUBBS on behalf of plaintiffs and a class, | ) ) ) ) | |
| Plaintiffs, | ) ) | 11-cv-5111 |
| v. | ) ) ) | Judge Joan H. Lefkow |
| MIDLAND CREDIT MANAGEMENT, INC.; MIDLAND FUNDING LLC; and ENCORE CAPITAL GROUP, INC., formerly MCM CAPITAL GROUP, INC., | ) ) ) ) ) | Magistrate Judge Martin C. Ashman |
| Defendants. | ) | |

**PLAINTIFF ANGELA FULLER F/K/A ANGELA GRUBBS' RESPONSE IN
OPPOSITION TO DEFENDANTS' AMENDED
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**FACTS**

On or about July 17, 2011, defendant MCM sent plaintiff Fuller a letter stating that she owed $7,201.63 on the debt. (Exhibit A, July 17, 2011 Collection Letter). Six months later, on or about January 19, 2012, Midland Funding, LLC, filed suit against Plaintiff Fuller to collect the alleged debt in the Circuit Court of Cook County. A copy of the complaint is attached as Exhibit B. (Am. Cmplt. Exhibit E; Am. Cmplt. ¶47). The complaint stated that the amount owed was $4,905.47. (Am. Cmplt. Exhibit E; Am. Cmplt. ¶48). This is $2,296.16 less than what Defendants' claimed was owed in their July letter. Attached to the complaint was an "Affidavit of Paula Hansen in Support of Judgment" (Exhibit B) which claimed Midland's "business records pertaining to this account" show that Fuller "owed a balance of $4905.47." (Am. Cmplt. Exhibit F; Am. Cmplt. ¶49)

Plaintiff retained counsel and defended the state court lawsuit. (Am. Cmplt. ¶51) On June 23, 2011, Midland Funding LLC nonsuited the state court lawsuit. (Am. Cmplt. ¶52). The July 17, 2011 letter seeking $7201.63 offered three "discount offers." (Am. Cmplt. ¶ 44).

The first plan, titled "Settle in Full," states that Plaintiff Fuller will receive a "Discount"

1

of "40% off" by paying $4,320.98 and that she would "Save: $2,880.65!" (Exhibit A; Am. Cmplt. Exhibit D; Am. Cmplt. ¶44)

The second plan, titled "Monthly Payments," states that Plaintiff fuller will receive a discount of "25% off" if she makes 12 monthly payments $450.10 (totaling $5,401.2). (Exhibit A; Am. Cmplt. Exhibit D; Am. Cmplt. ¶44)

The third plan, also titled "Monthly Payments," states that Plaintiff Fuller will received a discount of "10% off" if she makes 24 monthly of $270.06 (totaling $6,481.44). (Exhibit A; Am. Cmplt. Exhibit D; Am. Cmplt. ¶44) . The letter further states that all three options "will save you money." (Exhibit A; Am. Cmplt. Exhibit D; Am. Cmplt. ¶44).

Defendants send such letters falsely stating that consumers owe amounts greater than that which is actually owed in order to negotiate from the inflated amount. (Am. Cmplt. ¶¶ 53-55).

## I. DEFENDANTS COLLECTION LETTER VIOLATES THE FDCPA

Plaintiff Fuller alleges that Defendants send correspondence such as the "40% Discount Offer" letter received by Plaintiff Fuller to collect amounts greater than owed, in violation of 15 U.S.C. §1692(e)[1] and §1692(f). (Am. Cmplt. ¶¶53-54). Plaintiff's claim is that Defendants' "Discount Offer" inflates the amount of the debt in order to negotiate a settlement for higher amount. (Am. Cmplt. ¶¶ 53). Defendants' collection complaint and supporting affidavit are evidence of this unlawful inflation. (Am. Cmplt. 53). While the collection letter claims $7,201.63 is owed, but offers lower settlement amounts, the collection complaint only seeks $4,905.47. (Am. Cmplt. ¶¶ 44, 48). Plaintiff alleges that the amount sought in the collection complaint is the amount that Defendants can legally enforce.

### A. Defendants' Collection Letter Makes False and Misleading Statements and is a Deceptive Practice in Violation of the FDCPA

Defendants argue that the inflated amount of $7,201.63 is the amount "that is allowed by

---

[1] Plaintiffs' complaint alleges a violation of §1692e(5), "The threat to take any action that cannot legally be taken or that is not intended to be taken," based upon the letter received by Plaintiff Webb, not Plaintiff Fuller. Plaintiff Fuller does not assert that the letter she received violates §1692e(5).

law," (Def. Memo., p. 7) and that "Midland could have, but chose not to seek that amount in the lawsuit." (Def. Memo., p. 5) However, these are factual assertions which are not in the Amended Complaint. There is no evidence that the amounts owed were reduced. Neither Plaintiff, nor this Court, is required to accept Defendants' unsupported explanation as truth. Plaintiff's claim is that Defendants cannot legally enforce anything more than the $4,905.47 which it sought to collect at trial and its demand for more and statements of "savings" are false and misleading and constitute a deceptive practice to induce consumers to pay more than they can legally be required to pay. The affidavit attached to the complaint plainly states that the "business records pertaining to this account" show that Fuller " owed a balance of $4905.47." (Am. Cmplt. ¶49)

  Defendants' letter does not explain how the $7,201.63 amount was calculated. The collection complaint and affidavit do not explain how the $4,905.47 amount was calculated. Defendants in support of a motion to dismiss attempt to discuss interest being added to the debt. There is no evidence supporting Defendants' assertions and these assertions cannot be raised on a motion to dismiss. Discovery is required to respond to these unsupported arguments.

  Defendants' statement that if Plaintiff Fuller pays $4,320.98, she will receive a "Discount" of "40% off" or the equivalent of $2,880.65 in savings is false and misleading and a deceptive practice in violation of §§1692e and f. It is even more egregious that Defendants attempt to trick Plaintiff Fuller into paying more than the total amount of the debt through their "payment plans" when they do not seek to legally enforce more than $4,905.47. The first of the two payment plans would require Plaintiff fuller to pay 12 monthly payments $450.10, totaling $5,401.2, almost $500 more than Defendants can legally enforce at trial. (<u>Exhibit A</u>; Am. Cmplt. Exhibit D; Am. Cmplt. ¶44) The second of the two payment plans demands even more money. The second payment plan requires Plaintiff Fuller to make 24 monthly payments of $270.06, for a total of $6,481.44, almost $1,600 dollars more than Defendants sought to be legally enforced against Plaintiff. (<u>Exhibit A</u>; Am. Cmplt. Exhibit D; Am. Cmplt. ¶44). All of

3

these payment plans are presented as a "savings" to Plaintiff, and constitute a false and misleading statements as well as a deceptive practice as alleged in Plaintiff's complaint. (Am Cmplt. ¶¶42-60)

Defendants' citation to an Oregon District Court opinion in *Lane v. Daniel N. Gordon, P.C.,* 2011 U.S. Dist. LEXIS 11508 (D. Or. Feb. 7, 2011), is misplaced. That case was decided on a motion for summary judgment, after the parties had had the chance to conduct discovery and provide the Court with evidence on the issues of whether the interest added to the debt was valid and enforceable. The court then decided that since the evidence showed that the increased amount in the letter constituted valid interest which had accrued on the debt, "the amounts stated in the February 10 demand letter and in the July 2009 complaint were both correct," and thus, "defendant did not make a false statement." *Lane,* 2011 U.S. Dist. LEXIS 11508 at *3 (D. Or. Feb. 7, 2011) Here, there is no evidence that the amount sought from Plaintiff constituted lawful interest which had accrued on the alleged debt.

At the very least, Plaintiff is entitled to discovery as to the basis for Defendants' arguments that their actions in attempting to collect an inflated debt amount than that which they swore they could prove at trial was the result of lawful interest being applied to Plaintiff's account.

      **B.**    **Defendants' Collection Complaint Is Evidence That the Collection Letter Makes False Statements**

Defendants' argument that "[s]uing to collect a lower amount...is not an abusive debt collection practice," (Def. Memo., p. 9) misses the mark. As previously discussed, Plaintiff's claim is that the statements made in the collection letter attempt to collect more than the debt, i.e. the demand for payment in the amount of $7,201.63 and statements that Plaintiff "will save...money" by paying more than she can legally be required to pay are false and misleading as well as a deceptive practice. (Am. Cmplt. ¶¶ 42-60). The collection complaint and supporting affidavit attesting to the amount which is actually owed are evidence of this falsehood. (Am. Cmplt. ¶¶ 47-49). Plaintiff is not claiming that Defendants should have sued for a higher

4

amount, but that Defendants cannot inflate the amount without any lawful basis, for the purpose of inducing consumers to pay more than they would legally be required to pay if a judgment was entered against them. (Am. Cmplt. ¶¶42-60).

Accordingly, Defendants' reliance on *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 474 (7th Cir. 2007) is also misplaced. *Beler* merely holds that the FDCPA is "not an enforcement mechanism for *other* rules of state and federal law."(emphasis added) There are no other rules at issue in this litigation beyond the FDCPA. Plaintiff is not relying on any other state or federal law as a basis for her claims.

## II. ENCORE HAS BEEN HELD LIABLE FOR THE ACTS OF MIDLAND CREDIT MANAGEMENT AND MIDLAND FUNDING

Defendant Encore has been held liable as a debt collector for the acts of its subsidiaries based on similar allegations made by Plaintiff here. *See Hernandez v. Midland Credit Mgmt.*, 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. March 6, 2007) (as Amended September 25, 2007), *Miller v. Midland Credit Management, Inc.*, 621 F. Supp. 2d 621, 634-35 (N.D. Ill. 2009); *Herkert v. MRC Receivables Corp.,* 655 F. Supp. 2d 870 (N.D. Ill, 2009).

Judge Pallmeyer's detailed description of Encore's involvement in the debt collection process, in *Hernandez v. Midland Credit Mgmt.*, 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. March 6, 2007) (as Amended September 25, 2007), makes clear that Encore should be held "liable to the same extent as MCM on Plaintiff's [FDCPA] claims." Focusing on the extent of Encore's participation in the debt collection strategies and its relationship with MCM, the court found that there was "compelling evidence that Encore was involved in debt collection activity." Id. at *58.

Brandon Black, the President and CEO of Encore, has testified that he was responsible for "all of the collection activities." *Hernandez,* 2007 U.S. Dist. LEXIS at *17. Additionally, Carl Gregory, the previous CEO, described Black in 2004 as "the architect of many of the analytical procedures and collection processes that distinguish Encore's approach to the business." Id.

In *Hernandez*, the Court held that given "that Encore's CEO (and former COO) was instrumental in developing debt collection strategies in what can only plausibly be considered as his capacity with Encore, and that Encore and its officers have repeatedly referred to Encore's 'collection strategies' in SEC filings and conference calls, the court concludes that Encore was indeed 'thoroughly enmeshed in the debt collection business.'" *Hernandez*, at * 60.

In the *Herkert* litigation, Encore argued that it could not be held liable because it was merely "a holding company that purchases charged-off debts." The Court found Encore's argument "unavailing," and held that "Encore's own filings with the Securities and Exchange Commission indicate that it is in the business of collecting debts. *Herkert,* 655 F. Supp. 2d at 880. Similarly, in *Miller*, Encore also argued that it could not be held liable as a mere "holding company with no employees that does not purchase debt portfolios, send collection letters or own any past-due receivables." *Miller*, 621 F. Supp. 2d at 634. The Court rejected this argument finding that Encore's SEC filings alone "leave no doubt as to the debt collecting nature of the organization's activities." *Id.* at 635.

The allegations against Encore in *Hernandez*, *Miller*, and *Herkert*, are similar to those which have been asserted in the present litigation. Here, Plaintiff Fuller has alleged that MCM and Midland Funding LLC are under common ownership and both are subsidiaries of Encore. (Am. Cmplt. ¶19) Encore has stated in its filings with the Securities & Exchange Commission that "We are a leader in consumer debt buying and recovery. We purchase portfolios of defaulted consumer receivables at deep discounts to face value and use a variety of operational channels to maximize our collections from these portfolios." Form 10-K filed by Encore with the SEC for year ending Dec. 31, 2010, original page 1. (Am. Cmplt. ¶ 20)

Plaintiff alleges that Encore (a) secures funds from investors and lenders for the purpose of purchasing the debts to which Midland Funding LLC takes title, (b) devises the collection strategies used by the other defendants, and (c) participated in the debt collection activities complained of. (Am. Cmplt. ¶ 21)

On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios." Form 8-K filed by Encore with the SEC on March 10, 2005. (Am. Cmplt. ¶22) Encore is a "purchaser and manager of charged-off consumer receivables portfolios" – i.e., bad consumer debts. " (Form 8-K filed by Encore with the SEC on March 3, 2005, including Exhibit 99.1 thereto; Am Cmplt. ¶ 23)

Encore devises the "collection strategies" used by its subsidiaries. Form 10-K filed by Encore with the SEC for the year ending December 31, 2010, original p. 6, states, under "Collection Approach," that "We expand and build upon the insight developed during our purchase process when developing our account collection strategies for portfolios we have acquired. Our proprietary consumer-level collectability analysis is the primary determinant of whether an account is actively serviced post-purchase. Throughout our ownership period, we periodically refine this analysis to help determine the most effective collection strategy to pursue for each account." (Am. Cmplt. ¶ 27)

On Oct. 28, 2004, Encore CEO Gregory stated in an earnings conference call:

> . . . Our board also elected Brandon Black, President and Chief Operating Officer of the Company. Brandon has been Executive Vice President and Chief Operating Officer for the past 5 years and has done a superb job. Brandon is the architect of many of the analytical procedures and collection processes that distinguish Encore's approach to the business. His intelligence, analytical ability and drive for success have been instrumental in Encore's success and in his new role will be key factors as we continue to build the business. . . .
>
> On the purchasing front, we invested $21 million in new portfolios during the quarter, up 10 percent from the prior year's quarters purchases of $19 million. Our average purchase price for the quarter was 2.91 percent which was down slightly from last year's 3.02 percent. This was not as much as we had hoped to invest but appropriate given the high prices for much of the available supply.
> Year-to-date, our purchases have been $57 million or about $7 million less than last year's first 3 quarters. For the year-to-date, approximately 48 percent of our purchases have been non-credit card, compared with just 6 percent last year for the same period. We will have more to say about purchasing in a minute but the purchasing discipline and analytical approach we've always taken are more important now than ever before. . . .

(Am. Cmplt. ¶ 28)

On Aug. 3, 2004, Encore CEO Gregory stated in another such call:

7

> We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.
>
> The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.
>
> The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.
>
> We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external legal, and our recently developed agency outsourcing strategy.

(Am. Cmplt. ¶ 30)

Because of its intimate involvement in collection activities, Encore is a debt collector as defined in the FDCPA and can be held liable for the collection letters at issue in this litigation. (Am. Cmplt. ¶ 31)

        Respectfully submitted,

        s/Cassandra P. Miller
        Cassandra P. Miller

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

**CERTIFICATE OF SERVICE**

        I, Cassandra P. Miller, hereby certify that on July 6, 2012, a true and accurate copy of the foregoing document was filed via the Court's CM/ECF system, which sent notification of such filing to the following parties:

David M. Schultz
dschultz@hinshawlaw.com

Clifford E. Yuknis
cyuknis@hinshawlaw.com

                                                             s/Cassandra P. Miller
                                                             Cassandra P. Miller