**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELA FULLER f/k/a ANGELA GRUBBS, on behalf of plaintiff and a class, | ) | |
| Plaintiff, | ) | Case No. 11 C 5111 |
| v. | ) | Judge Joan H. Lefkow |
| MIDLAND CREDIT MANAGEMENT INC., MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC., | ) | |
| Defendants. | ) | |

**<u>OPINION AND ORDER</u>**

Plaintiff Angela Fuller (formerly known as Angela Grubbs) filed a second amended complaint ("SAC") on behalf of herself and a class against defendants Midland Credit Management, Inc. ("MCM"), Midland Funding, LLC ("Midland"), and Encore Capital Group, Inc. ("Encore") (collectively "defendants"). (Dkt. 111.) Fuller alleges defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.* Before the court is defendants' motion to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 113). For the reasons that follow, defendants' motion is denied.[1]

[1] The court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d). Venue is proper under 28 U.S.C. § 1391(b).

## BACKGROUND[2]

### I. The Parties

#### A. The Plaintiffs

Fuller brings this suit on behalf of herself and others from whom, they allege, defendants have improperly attempted to collect credit card debt. Although Fuller disputes incurring any debt, defendants pursued her for an alleged debt, sending her various notices and filing suit against her to recover amounts due. Fuller proposes a class consisting of (1) all natural persons with Illinois addresses sued by any of the defendants; (2) to whom any of the defendants have sent "pre-legal notifications" seeking an amount greater than that for which they ultimately sued the putative plaintiffs; (3) on or after a date one year prior to the original filing of the action; and (4) on or before a date 20 days after the original filing of this action.

#### B. The Defendants

Encore is the parent company of both Midland and MCM. It is a Delaware corporation and maintains offices at 8875 Aero Drive, Suite 200, San Diego, California.[2] Encore purchases consumer debt portfolios through Midland, MCM, and other subsidiaries, and devises the collection strategies for these subsidiaries. Encore's subsidiaries purchase these portfolios from major banks, credit unions, and utility providers.

Midland is a Delaware corporation with its principal place of business at 8875 Aero Drive, Suite 200, San Diego, California. Midland, which has no employees, seeks to enforce the purchased debts against consumers by filing lawsuits. The debts it seeks to enforce are mostly

[2] The facts in the background section are taken from the complaint and exhibits attached thereto and the court draws all reasonable inferences in Fuller's favor. *See Virnich* v. *Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

[2] It is not clear from the SAC where Encore's principal place of business is located.

balances due on credit cards issued by banks. Accordingly, Midland is a "debt collector" under the FDCPA.

MCM is a Kansas corporation whose principal place of business is also 8875 Aero Drive, Suite 200, San Diego, California. MCM is a collection agency that collects bad debts purchased by a third party, MRC, which is a subsidiary of Encore. MCM holds a collection agency license from the state of Illinois and is also a "debt collector" as defined by the FDCPA.

## II. Defendants' Debt Collection

On or about July 17, 2011, MCM sent Fuller a "discount offer" letter on behalf of Midland informing her that she owed a $7,201.63 debt. (*See* SAC Ex. A.) The letter offered Fuller three options for repaying this debt and did not contain any threat of suit. Thereafter, MCM sent Fuller a "pre-legal notification" letter on behalf of Midland demanding payment of the $7,201.63 debt and threatening to forward Fuller's account to an attorney if she failed to respond. Fuller does not have a copy of this letter and does not state when she received it. (*See* SAC Ex. B (copy of pre-legal notification sent to another person).) On or about January 19, 2012, Midland filed suit against Fuller in the Circuit Court of McLean County to collect on this debt. The complaint sought to recover $4,905.47 plus costs, representing the amount Fuller allegedly owed. (*Id.* Exs. E, F.) On June 23, 2012, Midland nonsuited the state court lawsuit.

Fuller alleges that it is the policy and practice of defendants to send correspondence such as "pre-legal notifications" and "discount offer" letters threatening legal action and falsely stating that consumers will save money by responding. The communications inflate the amount of the claimed debt and then offer to negotiate from the inflated amount. Fuller asserts that defendants engage in this behavior to collect amounts greater than those that defendants intend to or could seek when they take legal action. Fuller alleges that this policy and practice constitutes

a deceptive collection practice in violation of § 1692e and an unfair collection practice in violation of § 1692f of the FDCPA.

**III. Procedural Posture**

The original named plaintiff in this suit was Bonnie Webb, who filed her complaint on July 28, 2011. (Dkt. 1.) Webb alleged in her complaint that defendants violated the FDCPA by engaging in deceptive collection practices and unfair collection practices by sending consumers "pre-legal notifications." (*Id.* ¶¶ 33-34.) Webb alleged that she received one of these pre-legal notifications on September 21, 2010, and asserted claims on behalf of a class defined as "(a) all natural persons with Illinois addresses who were sued by any of the defendants (b) to whom any of the defendants previously sent a notice in the form represented by [the "pre-legal notification" letter] seeking an amount greater than that sued for (c) on or after a date one year prior to the filing of this action, and (d) on or before a date 20 days after the filing of this action." (*Id.* ¶ 50.)

Webb was granted leave to file a first amended complaint ("the FAC") (dkt. 60), which she did on May 8, 2012 (dkt. 71). The FAC added Fuller as a named plaintiff based on the facts relating to Fuller as described above. The court dismissed the FAC without prejudice on March 27, 2013. *See Webb* v. *Midland Credit Mgmt., Inc.*, No. 11 C 5111, 2013 WL 1285570 (N.D. Ill. Mar. 27, 2013) ("*Webb*"). In doing so, the court found that (1) the FAC did not state a claim against Encore directly or demonstrate why it would be appropriate to "pierce the corporate veil" to hold Encore liable; and (2) the FAC did not state a claim against Midland and MCM because it did not allege *how* the correspondence received by plaintiffs from Midland or MCM inflated the amount of the claimed debt or *why* it was false to say consumers would save money by acting in accordance with the correspondences. *See id.*

The court granted leave to file the SAC, which Fuller did on April 17, 2013. The SAC does not name Webb as a plaintiff (but still relies on the pre-legal notification sent to Webb, as Fuller no longer has hers (*see* SAC Ex. B)). Defendants filed a motion to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6). They argue that the SAC fails to state a claim against MCM and Midland because the FDCPA does not prohibit the collection of inflated debt amounts and there was nothing false or misleading about the "pre-legal notification" letter. They also argue that the SAC adds no allegations showing that Encore should be held liable for the conduct of Midland or MCM. Finally, they assert that the SAC is time-barred by the FDCPA's one-year statute of limitations and does not relate back to the original complaint.

**LEGAL STANDARD**

In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The allegations in the complaint must be "enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr*., 619 F.3d 741, 743 (7th Cir. 2010). Rather, it is the facts that count.

## ANALYSIS

### I. Whether the SAC Sufficiently Alleges a Violation of the FDCPA

The FDCPA prohibits "any false, deceptive, or misleading representation . . . in connection with the collection of any debt," 15 U.S.C. § 1692e, including the false representation of "the character, amount, or legal status of any debt," *id.* § 1692e(2)(A), a "threat to take any action that cannot legally be taken or that is not intended to be taken," *id.* § 1692e(5), and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *Id.* § 1692e(10). Additionally, the FDCPA prohibits the use of "unfair or unconscionable means to collect or attempt to collect any debt," *id.* § 1692f, including "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1). In deciding whether a collection letter violates the FDCPA, the court examines the letter from the standpoint of an unsophisticated consumer. *See Fields* v. *Wilber Law Firm, P.C.*, 383 F.3d 562, 564 (7th Cir. 2004); *Wahl* v. *Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645-46 (7th Cir. 2009) ("If a statement would not mislead the unsophisticated consumer, it does not violate the FDCPA—even if it is false in some technical sense."). This standard assumes the debtor is "uninformed, naive, or trusting," but at the same time acknowledges that even an unsophisticated debtor "possesses rudimentary knowledge about the financial world" and is "capable of making basic logical deductions and inferences." *Fields*, 383 F.3d at 564 (internal citations omitted). Because the "claims for violations of §§ 1692e and 1692f seem to go hand in hand," the court will address them together. *Nance* v. *Ulferts*, 282 F. Supp. 2d 912, 917 (S.D. Ind. 2003).

As part of her FDCPA claim, Fuller alleges that defendants seek to collect interest at a rate above that allowed by statute and above that to which she agreed. Under the Illinois Interest Act ("the IIA"), creditors are limited to "charging 9% interest where there is a written agreement, and 5% where there is not, unless the creditors qualify under the IIA as a type of entity that may enter into agreements to charge greater interest." *Foster* v. *Sherman Acquisition, LP*, No. 04 C 1072, 2005 WL 588995, at *5 (N.D. Ill. Mar. 8, 2005) (citing 815 Ill. Comp. Stat. 205/2; 205/4; 205/5). The interest rate that defendants could impose on Fuller depends on the rate she agreed to with her original creditor. *See Olvera* v. *Blitt & Gaines, P.C.*, 431 F.3d 285, 289 (7th Cir. 2005) ("[O]nce the assignors [of debt] were authorized to charge interest, the common law kicked in and gave the assignees the same right, because the common law puts the assignee in the assignor's shoes, whatever the size."); *see also PRA III, LLC* v. *Hund*, 846 N.E.2d 965, 970-72, 364 Ill. App. 3d 378, 301 Ill. Dec. 362 (2006). There is no allegation in the SAC that defendants were the types of entities that could charge above the statutory interest rate.

Defendants insist that Fuller has stated no new facts in her complaint and that it suffers from the same deficiencies that caused the court to dismiss the FAC. (Dkt. 115 at 3-5.) This court previously dismissed the FAC because it (1) did not "explicitly allege that these inflated amounts were false, deceptive or misleading;" (2) was "devoid of facts demonstrating that the amounts defendants sought to recover in their pre-legal notifications . . . were not authorized by the parties' agreements or were otherwise prohibited by law;" and (3) lacked "allegations plausibly suggesting that the interest identified in the letter was somehow improper or that defendants were indeed attempting to collect at an inflated interest rate," such that "plaintiffs' claim that the letter violated the FCDPA [was] mere speculation." *Webb*, 2013 WL 1285570, at *3, *4 n.5.

But Fuller has added allegations to the SAC to cure these defects. First, Fuller switched the bases of her claim to the pre-legal notification that she received, which allegedly attempted to collect interest calculated at a rate of 15 percent. This 15 percent interest, she insists, is "beyond the statutory rate." (Dkt 117 at 4.) She goes on to allege that defendants are barred from charging above the statutory rate for a variety of reasons: (1) defendants do not possess documents to provide a legal basis to collect interest in excess of the statutory amount (SAC ¶ 50); (2) defendants do not have sufficient records to prove any amount of contractual interest (*id.* ¶ 58); (3) defendants have no legal basis for adding interest to the debt owed by Fuller (*id.* ¶ 48); (4) defendants knew the suit following the pre-legal notification would seek less than the letter itself (*id.* ¶ 61); and (5) defendants' collection attorneys only sue for interest which is supported by documentation related to the debt and did not sue for the interest (*id.* ¶ 56).

Taking Fuller's allegations that defendants threatened to charge more than nine percent interest as true, she can succeed if she did not expressly agree to the fifteen percent interest rate or if that interest rate was not permitted by Illinois law. *See Foster*, 2005 WL 588995, at *5. Her complaint states both. No one has informed the court of the interest rate that Fuller agreed to with respect to the underlying debt or the maximum rate that defendants could charge under Illinois law. In the absence of these facts, it is appropriate to deny a motion to dismiss because it is possible the plaintiff could succeed by showing the defendant could not legally have charged the amount it did or threaten to charge. *See id.* at *6 ("Since both parties are silent as to the issue of the original creditors' ability to charge more than 9% interest under the IIA, it is possible that plaintiffs could succeed on [their claim under 15 U.S.C. §§ 1692e, 1692f] by marshaling facts to show that [the defendant] could not legally have charged more than 9% interest as to any or all of the plaintiffs—because [the defendant] was not licensed to do so itself under the IIA and because

(perhaps) neither were the assignors of the debts at issue."); *Olvera* v. *Blitt & Gaines, P.C.*, No. 03 C 6717, 2004 WL 887372, at *5 (N.D. Ill. Apr. 26, 2004) (denying motion to dismiss plaintiff's 15 U.S.C. §§ 1692e and 1692f claims where neither party informed the court what rate plaintiff agreed to pay original creditor). Moreover, defendants' representation to Fuller regarding accrued interest was material and misleading because it "substantially changes the amount allegedly due." *Terech* v. *First Resolution Mgmt. Corp.*, 854 F. Supp. 2d 537, 544 (N.D. Ill. 2012) (denying motion to dismiss 15 U.S.C. § 1692e claim where plaintiff alleged defendant represented it was entitled to collect back-interest even though it was not). Fuller states a claim for violation of 15 U.S.C. §§ 1692e and 1692f.

**II. Statute of Limitations**

Even if Fuller states a claim under the FDCPA, defendants argue, it must be dismissed because it is barred by the statute of limitations and does not relate back to the original complaint Webb filed in 2011. The statute of limitations is an affirmative defense that need not be anticipated in the complaint to survive a motion to dismiss. *United States* v. *Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). But "a party may plead itself out of court by pleading facts that establish an impenetrable defense to its claims." *Tamayo* v. *Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008). Where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense" the court may dismiss a claim in a Rule 12(b)(6) motion if the claim is precluded by a statute of limitations defense. *Lewis*, 411 F.3d at 842.

Under the FDCPA, a plaintiff must bring suit "within one year from the date on which the violation occurs." 15 U.S.C § 1692k(d). Fuller filed her SAC on April 17, 2013. Webb filed her original complaint on July 28, 2011. (Dkt. 1.) The defendants argue the statute of limitations expired because Fuller was not part of the original class asserted in original Plaintiff

Webb's complaint. "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been" members of the class asserted in the original complaint, *Am. Pipe & Const. Co.* v. *Utah*, 414 U.S. 538, 554, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974); *Sawyer* v. *Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 561 (7th Cir. 2011), not just the named plaintiffs. *Crown Cork & Seal Co.*, v. *Parker*, 462 U.S. 345, 353-54, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983); *Sawyer*, 642 F.3d at 561. Webb asserted claims on behalf of a class defined as (1) all natural persons with Illinois addresses who were sued by any of the defendants; (2) to whom any of the defendants previously sent a notice in the form represented by the "pre-legal notification" letter seeking an amount greater than that sued for; (3) on or after July 28, 2010; and (4) on or before August 17, 2011. (Dkt. 1 ¶ 50.)

Under *Crown Cork*, Fuller must have been a proper member of the asserted class in Webb's original complaint. *Sawyer*, 642 F.3d at 561. Webb's asserted class only covered those who received a pre-legal notification letter on or before August 17, 2011. Fuller has not alleged she received the pre-legal notification letter on or before August 17, 2011. *Crown Cork* thus does not apply to toll the running of the statute of limitations on Fuller's claim as of the date Webb filed the original complaint. *See, e.g.*, *Dugan* v. *Washington*, No. 99 C 4382, 2000 WL 336554, at *5 (N.D. Ill. Mar. 28, 2000) (plaintiff whose claim stemmed from December 1993 could not state statute of limitations was tolled for him based on class action filed in 1992 based on conditions in 1992 and earlier).

Nonetheless, when Fuller first joined this suit in the FAC, her claims were not time-barred. Fuller states in her complaint MCM sent her a "discount offer" letter on July 17, 2011. (SAC ¶ 37.) She also states that she received a "pre-legal notification" like the one attached to the SAC that was sent to Webb. (*Id.* ¶ 45.) She explains it is "Defendants' regular and

consistent practice to send a pre-legal notification on accounts selected for litigation, subsequent to sending [discount offer letters] and prior to filing suit against a consumer." (*Id.* ¶ 41.) Midland filed suit against her on January 19, 2012. (*Id.* ¶ 52.) Fuller joined this litigation soon thereafter: Webb moved to file her FAC adding Fuller on March 8, 2012 (dkt. 56) and actually filed the FAC on May 8, 2012 (dkt. 71). Reading the SAC in the light most favorable to Fuller, as the court must do at this stage, she received the pre-legal notification between July 17, 2011, and January 19, 2012. Even if Fuller's clock began to run on July 17, 2011,[3] her claim would still be timely because she brought her suit within one year. The filing of the FAC was within the statute of limitations for Fuller to bring suit and thus tolled the statute of limitations as to Fuller. At this point in the litigation the court cannot say that Fuller has pled herself out of court due to the statute of limitations.[4]

## III. Whether the SAC states a claim against Encore

In dismissing the FAC, the court held that Webb and Fuller failed to state a claim against Encore because they did not plead sufficient facts to cause the court to "pierce the corporate veil" and hold Encore liable for the actions of its subsidiaries, nor did they show how Encore was directly responsible for any alleged FDCPA violation. *Webb*, 2013 WL 1285570, at *2. Defendants argue that the SAC still fails to plausibly show that Encore should be held liable for the conduct of Midland and MCM. Fuller counters that Encore is a proper defendant because (1) it was directly involved in the debt collection activities at issue; and (2) it is appropriate to pierce MCM and Midland's corporate veils to hold Encore liable.

[3] Having determined that Fuller's claim would have been timely even had she filed on this early date, the court need not delve into the question of when the statute of limitations began running because July 17 is the earliest date that Fuller's statute of limitations clock could have begun to run.

[4] Because the SAC is not barred by the statute of limitations, the court need not address whether the SAC "relates back" to Webb's original complaint pursuant to Federal Rule of Civil Procedure 15(c).

**A. Encore's direct liability**

Encore's name does not appear on the "pre-legal notification" or "discount offer" letters at issue—not on the "discount offer" sent to Fuller, not on the "pre-legal notification" sent to Webb, and not on any of the other letters sent to unnamed plaintiffs that Fuller attaches to her complaint. (SAC Exs. A, B, D.) Nevertheless, Fuller alleges that Encore was involved in the claimed FDCPA violations because Encore created the policy to determine the amount of debt to claim in the pre-notification letters.

A corporate parent is generally not subject to the FDCPA unless it can be demonstrated that it is a direct debt collector or that it collects debt indirectly by sharing an interdependence with its subsidiary that renders them a "single economic enterprise." *Jenkins* v. *Union Corp.*, 999 F. Supp. 1120, 1142-43 (N.D. Ill. 1998); *see also Miller* v. *McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872, 876 (7th Cir. 2000) (explaining that, "save in exceptional circumstances," one affiliated corporation is not liable for the debts of the other, "a principle applicable in suits under the [FDCPA]"). Even if a plaintiff can demonstrate that a parent is itself a debt collector, the plaintiff must still point to evidence that the parent participated in the allegedly wrongful debt collection. *See Stepney* v. *Outsourcing Solutions, Inc.*, No. 97 C 5288, 1997 WL 722972, at *2 (N.D. Ill. Nov. 13, 1997).

Fuller does not cite a single case to demonstrate the facts she alleges against Encore are sufficient to hold it directly liable. While the SAC adds extensive quotations from Encore's SEC filings and management team describing company-wide policies and practices that allegedly show Encore is a debt collector under the FDCPA, the FAC contained equivalent statements by Encore and its management team. (*Compare* FAC ¶¶ 19-31, 56 *with* SAC ¶¶ 19-34, 63, 69.) In fact, the only addition to the SAC that demonstrates Encore's "direct[ ] involve[ment]" with

Fuller's claims is her statement that "Encore is directly involved in the FDCPA violations listed above." (SAC ¶ 69.) But her support for this paragraph can also be found in the FAC. (*See, e.g.*, FAC ¶ 27 ("*We* expand and build upon the insight developed during *our* purchase process when developing *our* account strategies for portfolios *we* have acquired.") (quoting Encore 2010 10-K form) (emphasis added); *id.* ("Encore devises the 'collection strategies' used by its subsidiaries."); *id.*at ¶ 30 ("Prior to purchase and throughout *our* ownership, *we* analyze the customer's ability and willingness to pay.") (quoting Encore CEO's August 3, 2004 statement) (emphasis added)). Fuller fails to demonstrate how Encore was involved in her debt collection proceedings or add substantially different allegations to her amended complaint.

**B. Encore's indirect liability**

In the alternative, Fuller argues that Encore is indirectly liable for MCM and Midland's activities as their parent. To hold Encore liable for the acts of its subsidiaries' the court would have to pierce the corporate veil, as "a parent corporation may not be held to account for the liabilities of a subsidiary unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters." *Esmark Inc.* v. *N.L.R.B.*, 887 F.2d 739, 753 (7th Cir. 1989). "Veil-piercing is an equitable remedy governed by state law." *Laborers' Pension Fund* v. *Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009); *see also Hamilton* v. *Am. Corrective Counseling Servs., Inc.*, No 3:05 CV 434, 2009 WL 3245194, at *11 (N.D. Ind. Sept. 30, 2009) (state law, not federal law, should apply to veil piercing inquiry in FDCPA claims); *but see Stepney*, 1997 WL 722972, at *3 (federal common law, not Delaware law, should apply to veil piercing inquiry in FDCPA suit, but noting that factors for veil piercing under federal law and Delaware law were "parallel"). The applicable state law to evaluate piercing the corporate veil is the state of incorporation whose veil is sought to be pierced. *See On Command Video*

*Corp.* v. *Roti*, 705 F.3d 267, 272 (7th Cir. 2013). Midland is incorporated in Delaware and MCM is incorporated in Kansas, putting those two states' veil piercing analyses at issue.

**1. Piercing the Corporate Veil in Delaware – Midland**

Courts in Delaware have cautioned that "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P.* v. *Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (quotation omitted). There are two routes that a plaintiff can take in urging a court to do so: she can argue for piercing of the corporate veil under an alter ego theory, or she can argue under an agency liability theory. *Trevino* v. *Merscorp, Inc.*, 583 F. Supp. 2d 521, 528-32 (D. Del. 2008). Fuller does not explicitly refer to either (or even cite a case to demonstrate why disregarding the corporate form is appropriate). While the test to pierce the corporate veil under the alter ego theory is the familiar multi-factor list that examines the degree of control a parent exercises over a subsidiary,[5] the test under an agency theory "differs from the alter ego theory in that it attributes specific acts to the parent because of the parent's authorization of those acts, but does not treat the parent and the subsidiary as one entity." *C.R. Bard, Inc.* v. *Guidant Corp.*, 997 F. Supp. 556, 560 (D. Del. 1998) (citing *Stinnes Interoil, Inc.* v. *Petrokey Corp.*, No. 82C-JN-109, 1983 WL 21115, at *2 (Del. Super. Ct. Aug. 24, 1983)). It requires the plaintiff alleging "an arrangement . . . between the two corporations so that one acts on behalf of the other and within usual agency principles," and that "the arrangement [ ] be relevant to the plaintiff's claim of wrongdoing." *Phoenix Canada Oil Co. Ltd.* v. *Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988). "Under Delaware law,

[5] The Third Circuit Court of Appeals has boiled Delaware's requirements down to a seven-part test: (1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the corporation; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. *See United States* v. *Pisani*, 646 F.2d 83, 88 (3d Cir. 1981); *Phoenix Canada Oil Co. Ltd.* v. *Texaco, Inc.*, 842 F.2d 1466, 1476 (3d Cir. 1988); *Trevino* 583 F. Supp. 2d at 528-29.

proof of agency within the context of a parent-subsidiary relationship requires that the plaintiff 'demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship.'" *Jurimex Kommerz Transit G.M.B.H.* v. *Case Corp.*, 65 F. App'x 803, 808 (3d Cir. 2003) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3d Cir. 2001)). The court must avoid "the notion that a parent company can be held liable for the obligations of a subsidiary [under the agency theory] purely on the basis of domination and control." *Mobil Oil Corp.* v. *Linear Films, Inc.*, 718 F. Supp. 260, 271 n.15 (D. Del. 1989). Instead, there must be a "close connection between the relationship of the two corporations and the cause of action." *Id.* at 271.

Reading the SAC in the light most favorable to Fuller, the facts alleged reasonably support the inference that Encore directed Midland's alleged misconduct. Fuller has alleged sufficient facts in her complaint to pierce the corporate veil under the agency theory. The SAC alleges that (1) Midland is a subsidiary of Encore; (2) Encore devises collection policies and practices for Midland; (3) Encore shares common officers and directors with its subsidiaries; (4) Midland has no employees; (5) a number of Encore's officers are located at Midland's principal place of business; and (6) and the corporate form exists only to "insulate [Encore] from FDCPA liability." (SAC ¶¶ 19, 21, 70-72.) Moreover, the quotations that Fuller includes from Encore's various SEC filings and from talks that its officers have given do make it seem as though Midland and MCM "act[ ] on behalf" of Encore when they pursue the various debt collection strategies as devised by Encore.[6] *Jurimex*, 65 F. App'x at 807 (citations omitted). These

[6] "Delaware jurisprudence rejects the suggestion that a parent corporation's acknowledgment of ownership in a subsidiary in its required SEC filings subjects the parent to corporate veil piercing." *Kidd* v. *Symbion, Inc.*, CIV.A. 10-3361, 2011 WL 4020814, at *10 (E.D. La. Sept. 9, 2011) (citing *BASF Corp.* v. *POSM Props. P'ship, L.P.*, No. 3608-VCS, 2009 WL 522721, at *8 (Del. Ch. Mar. 3, 2009)). Here, however, not only does Encore acknowledge its subsidiaries in its filings but it insinuates that it acts through its subsidiaries and its subsidiaries only act on its behalf. Fuller has alleged far more regarding

allegations suggest a close connection in the operations of Encore and its subsidiaries, making it reasonable to infer that Encore "authorized or directed" its subsidiaries' acts. *See StrikeForce Techs., Inc.* v. *PhoneFactor, Inc.*, No. 13-490-RGA-MPT, 2013 WL 6002850, at *5 (D. Del. Nov. 13, 2013) (allegations that parent and subsidiary operated at same location, shared same board of directors, and had same governance policies and procedures adequate to survive motion to dismiss claims against parent under agency theory). While "Delaware law favors protecting parent corporations from the actions of its subsidiaries," *O'Leary* v. *Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *8 (Del. Super. Ct. Jan. 14, 2011), it will not do so where the complained of conduct was "instigated" by the parent. *StrikeForce*, 2013 WL 6002850, at *5. Fuller adequately alleges that Encore instigated all practices of its subsidiaries and thus her claims against Encore that are derivative of Midland's actions survive the motion to dismiss.[7]

### 2. Piercing the Corporate Veil in Kansas - MCM

Under Kansas law, "[w]here it is apparent the relationship between the parent and its subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two are so mingled that the recognition of distinct entity would result in injustice to third persons, courts will look through the legal fiction of separate entities and treat them as justice requires." *Doughty v. CSX Trans. Inc.*, 905 P.2d 106, 110-11 (Kan. 1995).

---

the relationship between Encore and its subsidiaries than the plaintiffs did in cases such as *Kidd* and *BASF*. *See Kidd*, 2011 WL 4020814, at *10 (SEC filing contained only a "general description" of parent's business practices without any reference to the subsidiary); *BASF*, 2009 WL 522721, at *8 (insufficient for plaintiff to rely on the sole statement in parent's financial statement that it operated subsidiary's business when there was nothing else to support the "rational inference" parent actually operated subsidiary's business).

[7] Having determined that Fuller has adequately asserted a claim for veil piercing to survive the motion to dismiss under the agency theory method, it need not go through the exercise for the alter ego method.

Kansas courts have adopted ten factors as guidelines to determine whether a court should pierce a corporate veil, although "[n]o single factor is conclusive in determining whether to apply the alter ego doctrine." *W&W Steel, LLC* v. *BSC Steel, Inc.*, 944 F. Supp. 2d 1066, 1073 (D. Kan. 2013). The ten factors are: (1) whether the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) whether the corporations have common directors or officers; (3) whether the parent corporation finances the subsidiary; (4) whether the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise causes its incorporation; (5) whether the subsidiary has grossly inadequate capital; (6) whether the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) whether the subsidiary has substantially no business except with the parent corporation, or no assets except those conveyed to it by the parent corporation; (8) whether in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division; (9) whether the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) whether the formal legal requirements of the subsidiary as a separate and independent corporation are observed. *See Helsop* v. *UCB, Inc.*, 175 F. Supp. 2d 1310, 1317 n.5 (D. Kan. 2001) (citing *Int'l United Auto.* v. *Cardwell Mfg. Co.*, 416 F. Supp. 1267, 1286 (D. Kan. 1976)). A court will only pierce the corporate veil "reluctantly and cautiously." *Kvassay* v. *Murray*, 808 P.2d 896, 904 (Kan. Ct. App. 1991).

For purposes of surviving a motion to dismiss, "which merely tests the adequacy of the pleadings," Fuller has made adequate allegations as to Encore's relationship with its subsidiaries to support veil-piercing liability. *US Telecom, Inc.* v. *535 Live, Inc.*, Nos. 91-2281-L, 91-2282-L, 1992 WL 151921, at *2 (D. Kan. Feb. 10, 1992) (denying defendant's motion to dismiss veil-piercing claim). The SAC alleges that (1) MCM is a subsidiary of Encore; (2) Encore devises

collection policies and practices for MCM; (3) Encore shares common officers and directors with its subsidiaries; (4) MCM has little or no net worth; (5) a number of Encore's officers are located at the office where MCM has its principal place of business; (6) the corporate form exists only to "insulate [Encore] from FDCPA liability[;]" and (7) MCM acts at the direction and on behalf of Encore. (SAC ¶¶ 19, 21, 70-72.) Although "the application of the various factors noted above do not all point in one direction[,] . . . [w]hether the doctrine should be applied here must be based upon a consideration of the facts." *W&W Steel*, 944 F. Supp. 2d at 1073-74 (denying motion to dismiss based on veil piercing where the alleged facts showed that the "policy and practices" of the parent and subsidiary were such that the subsidiary had "no separate mind, will, or existence of its own and is but a business conduit for its principal") (citing *Pemco, Inc.* v. *Kan. Dep't of Rev.*, 907 P.2d 863, 867 (Kan. 1995); *Commerce Bank, N.A.* v. *Liebau-Woodall & Assoc., L.P.*, 20 P.3d 88, 94 (Kan. Ct. App. 2001)). The court thus denies Encore's motion to dismiss claims against it at this stage in the proceedings.

**CONCLUSION**

Defendants' motion to dismiss the SAC as to plaintiff Fuller (dkt. 115) is denied. Defendants are to answer the SAC by March 27, 2014. The parties shall report for a scheduling conference on April 17, 2014 at 11 a.m.

Date: March 6, 2014

Joan H. Lefkow
U.S. District Judge Joan H. Lefkow